## Lockington's Case.

[ NOVEMBER 23, 1813. ]

The judges of the state courts have authority to issue writs of *habeas corpus* to bring up the bodies of persons committed to prison under the asserted authority of the United States.

The act of congress of July 6, 1798, authorized the president to direct the confinement of alien enemies, although such confinement or restraint was not for the purpose of removing them from the United States.

The act having authorized the president to direct the confinement of alien enemies, necessarily conferred on him all the means to enforce his orders; and the marshals of the districts were the proper persons to execute such orders.

It was not necessary that the judicial authority should be called in to enforce the regulations of the president, in respect to alien enemies; and the marshal might act without such authority.

HABEAS CORPUS, returnable before the chief justice, directed to Joseph Cornman, keeper of the debtors' apartment of the prison of the city and county of Philadelphia, commanding him to produce the body of Charles Lockington, by him detained in prison. The facts of the case sufficiently appear in the opinion of the chief justice.

[ Lockington's Case. ]

The case was argued by *Mr. Hare,* for the prisoner, who cited 2 Inst. 57; *Magna Charta,* c. 30; Vattel, b. 3, c. 4, § 63; 10 Johns. 69, 117, 328; *Olmsted's Case,* ante, p. 9.

*Mr. Dallas,* district attorney of the United States, cited Act of 6th July, 1798; Act of 6th July, 1812, § 6; Vattel, b. 3, c. 17, §§ 269, 273, 274, 276; 2 Burr. 765; 2 Bl. Rep. 132; Doug. 403; 9 Johns. 239; 2 Hall's Law Journ. 192; 1 Johns. Cas. 136.

TILGHMAN, C. J.—From the return to this writ of *habeas corpus,* and the evidence which has been produced, it appears, that Charles Lockington, who is a subject of the British king, came into the United States before the declaration of war, and has never been naturalized. His business was connected with commerce; and on the 18th of July, 1812, he reported himself to John Smith, marshal of the district of Pennsylvania, as an alien, and British subject. On the 19th of March, 1813, he applied, as an alien enemy, for the marshal's passport, to repair to Lancaster, which was granted; and, at his own request, afterwards changed to Reading; in pursuance of an order issued from the office of the secretary of state, by which all alien enemies (with certain exceptions, not including the case of Mr. Lockington) were directed to retire to a place above forty miles from tide water, to be designated by the marshal. On the 9th of the present month, the marshal found Mr. Lockington in this city, in violation of the order above mentioned; upon which he required him to retire to Reading. This being refused by Mr. Lockington, the marshal took him into his custody, and placed him, for safe keeping, in the debtors' apartment of the prison of the city and county of Philadelphia, until he could be conveyed, or would consent to retire, to Reading, or should be discharged by due course of law. The reason assigned by Lockington, for coming from Reading to Philadelphia, was

the want of money to subsist in Reading; and he offered to return thither, if the marshal would furnish him with money. War having been declared by the congress of the United States, on the 18th of June, 1812, proclamation of that event was made by the president on the day following. On the 7th day of July, in the same year, a notice was issued from the department of state, and published in those newspapers in which the laws of the United States are published, by which all British subjects were required to make report of themselves to the marshals of the districts in which they resided; and, at the same time, the several marshals were directed to cause the laws which relate to alien enemies, to be published, in order that such persons might be informed of the situation in which they stood. Those laws were accordingly published. On the 23d of February, 1813, an order was issued from the department of state, and published in the newspapers, by which " alien enemies, residing or being within forty miles of tide water, were required forthwith to apply to the marshals of the states or territories in which they respectively resided, for passports, to retire to such places, beyond that distance from tide water, as should be designated by the marshals," subject to certain exceptions, not affecting the present case. At the same time, the several marshals of the United States received instructions from the department of state, to take into custody, and convey to the places assigned to them, all persons to whom the said requisition was applicable, and who did not immediately conform to it. On the 15th of April, 1813, the several marshals were informed, by a notice from the department of state, that the president had appointed John Mason, Esq., commissary general for prisoners of war, " including the superintendence of alien enemies;" and that, in future, all letters and documents on those subjects were to be addressed to that gentleman; and all instructions from him in relation to the same, were to be obeyed, unless other-

[Lockington's Case.]

wise directed from the department of state. On the 31st of May, 1813, a circular letter, signed by John Mason, was addressed to the several marshals of the United States, and published in the newspapers. This letter was dated " Office of Commissary General of Prisoners, Washington, May 31, 1813," and is expressed in the following form: " The president being desirous of defining more particularly, the treatment of alien enemies, and of extending as much indulgence to them as may be compatible with the precautions made necessary by the present state of things, directs, that, in regard to such as may be within your district, you will be governed by the following rules. You will cause to be removed, as heretofore prescribed, if not already done, under the former orders from the department of state, all who are not females or under eighteen years of age, who are not labourers, mechanics or manufacturers, arrived in the country previous to the declaration of war, and actually employed in their several vocations; subject, however, to the following modifications." Then follow the modifications, none of which apply to Mr. Lockington. These are all the facts of any importance on the present question.

It has been contended, that the orders issued from the public offices are not to be considered as the acts of the president; and that, if they are his acts, they are not authorized by law. Both these objections shall be considered; but I shall first advert to the point, introduced in the suggestion filed by the marshal, which goes to the jurisdiction of a state judge, in cases like the present. It is supposed that the state judges have no authority to issue a writ of *habeas corpus*, because the power of declaring war being vested in the congress of the United States, all matters appertaining to that subject must be under their control; that congress, if it had pleased them, might have considered alien enemies as prisoners of war, who are not entitled to the benefit of a writ of *habeas corpus*; and,

finally, that as the laws of the United States have given to the state judges a certain jurisdiction, with respect to alien enemies, (which I shall have occasion to mention hereafter) but have not given to them authority to interpose by a writ of *habeas corpus*, that writ ought not to be issued. In answer to these suggestions, it is to be observed, that the authority of the state judges, in cases of *habeas corpus*, emanates from the several states, and not from the United States. In order to destroy their jurisdiction, therefore, it is necessary to show, not that the United States have given them jurisdiction; but that congress possess, and have exercised, the power of taking away that jurisdiction, which the states have vested in their own judges. Our act of assembly directs, that, in all cases " where any person, not being committed or detained for any criminal or supposed criminal matter, shall be confined or restrained of his liberty, under any colour or pretence whatsoever," he shall be entitled to a writ of *habeas corpus*. Now, it is no answer to this law to say, that, being made before the present constitution of the United States was established, it could not be intended to apply to cases arising under the constitution. The people of Pennsylvania still remain citizens of the commonwealth, as well as of the United States; and it is of as much importance to them to be relieved from unlawful imprisonment, under colour of authority derived from the United States, as from any other imprisonment. When the present federal constitution was adopted, the people were not easy until they had obtained an amendment, declaring that the powers not delegated to the United States, by the constitution, nor prohibited by it to the states, were reserved to the states respectively, or to the people. A writ of *habeas corpus* must, therefore, be issued in all cases where the right to issue it has not been given up to the United States. That this right has not been given up, was my opinion, delivered in the case of *Olmsted*, where I assigned reasons which I

shall not now repeat. But this is not all. It is a princi-
ple well established, that even in cases where congress
might assume an exclusive jurisdiction, the authority of the
states remains until such a jurisdiction is assumed. There
are many instances in which the powers of the United
States are suffered to lie dormant; such as the power of
establishing uniform laws on the subject of bankruptcies;
and, while the power remains dormant, the several states
regulate the subject. In subjects also within the jurisdic-
tion of congress, when they do legislate, the authority of
the states is taken away only so far as the law of the
United States declares. This is exemplified in the act
establishing the judicial courts of the United States, where
it will be found, that in some instances the courts of the
United States are vested with an exclusive jurisdiction; but
in many more they have jurisdiction concurrent with the
courts of the several states. And although it is true, that,
by the terms of the act, the courts of the United States
have only a concurrent jurisdiction, yet I apprehend the
construction would be the same, if the express terms had
been omitted. By the 14th section of the same act, power
is given to the judges of the United States to grant writs
of *habeas corpus*, for the " purpose of an inquiry into the
cause of commitment; provided that they shall in no case
extend to prisoners in jail, unless where they are in cus-
tody under, or by colour of the authority of the United
States, or committed for trial before some court of the
same, or are necessary to be brought into court to testify."
Now, if it had been intended to exclude the state judges,
this is the place in which we might expect to find evidence
of such intention: for, the subject was full in the mind of
the legislature, as appears by the care with which they
restrained their own judges from interfering with commit-
ments not under the authority of the United States.

The judicial power of the United States extends to all
cases in law or equity, arising under the constitution, the

laws of the United States, and the treaties made under their authority. Supposing that congress had the right to assume an exclusive jurisdiction in all cases founded immediately on these subjects, the exercise of it would be intolerably grievous, without a great increase of courts and judges; and, even then, it would often happen, that the state courts would have to decide on the constitution, laws and treaties of the United States, on questions arising collaterally, in causes within their jurisdiction. Still, the authority of the United States may be preserved, by retaining, as they have retained, an appeal to their own courts. But it seems to be the general opinion, that from a decision on a *habeas corpus*, no appeal or writ of error lies; and thus, points of vital importance to the United States may be determined by state judges, without an opportunity of revision. This may certainly be a very serious evil, but it does not appear to be without remedy. For, although by the general principles of law, an appeal or writ of error might not lie; yet the subject being within the power of congress, they may regulate it as they please. As to an attempt to take away from the state courts altogether the right of issuing a writ of *habeas corpus*, in any case where a man pretends to justify an imprisonment under the authority of the United States; whenever the subject shall be brought before congress, it will be found to be attended with very great, if not insuperable difficulties.

I have said thus much on the point of jurisdiction (although I consider it as having been long settled and acted upon by the supreme court of this state) because some persons of high standing in other states, for whose opinions I entertain the most sincere respect, have expressed doubts on the subject. It is a matter deserving the greatest consideration, in which the people of the different states are deeply interested. The inconvenience of clashing opinions between federal and state judges, may sometimes be felt; but when I consider the situation of a Pennsylvanian, im-

[ Lockington's Case. ]

prisoned unlawfully, by colour of a pretended authority from the United States, on the banks of the Ohio, or the shore of Lake Erie, with only one federal judge to whom he can apply, and that judge in the city of Philadelphia, I feel as little inclination as I have right, to surrender the authority of the commonwealth.

But there is another objection to this *habeas corpus*, applicable equally to the judges of the states and of the United States: it is, that Mr. Lockington is in the situation of a prisoner of war. If he be so, he is not entitled to a privilege which never could have been intended for persons of that description. A prisoner of war is subject to the laws of war; he is brought among us by force; and his interests were never, in any manner, blended with those of the people of this country. He has no municipal rights to expect from us. We gave him no invitation, and promised him no protection. His object was to injure us; and we bring him hither solely for safe keeping. Far different is the case of a great body of people, who, although now placed in the situation of enemies, by events over which they had no control, yet, in their hearts may bear no enmity to the United States: nay, who may even prefer this country to their native soil. Many of them came among us, with a view of sharing our fortunes. Our laws held out invitations: they were suffered to acquire property, personal and real; we permitted them to swear that they intended to renounce their native sovereign, and become fellow citizens with us. Many, it is true, came merely on business, without such intent, and may be really inimical. But even they had that implied promise, which civilized nations have long been supposed to make, that, in case of sudden war, there should be permission to depart in a reasonable time, without injury to person or property. I am far from denying, however, that the condition of these people is to be decided, not by a reference to the usual courtesy of nations, but by our own laws. Congress had

[ Lockington's Case. ]

the power of legislating on the subject: they have exercised that power; and their acts are paramount to all foreign customs. It is these acts which we are now to consider, and it will be found that they are such as the most civilized nation need not blush to avow. They preserve a sacred regard for treaties; and, in cases where no treaty exists, they vest the president of the United States with full powers, to be exercised "according to the dictates of humanity, and national hospitality:" not forgetting, however, a due regard to the public safety. It has lately been decided, by the supreme court of New York, in the case of *Clarke* v. *Morey*, 10 Johns. 69, that British aliens residing in the United States, so far from being considered as prisoners of war, may sue and be sued, as in time of peace.

The act respecting alien enemies was passed on the 6th of July, 1798. In considering it, I shall not pursue the wide range which was taken in the argument of this case. In fixing its true construction, it is of no importance under what administration it was enacted; by whom it was brought forward; or by whom advocated or opposed, on its passage. It is the law of the land; and, being so, it becomes the duty of every individual to obey, and of every court to enforce obedience.

It begins by enacting, that when war is declared, or invasion by a foreign nation is perpetrated, attempted or threatened, and the president of the United States shall have made public proclamation of the event, "all natives, citizens, denizens or subjects of the hostile nation or government, being males of the age of fourteen years and upwards, who shall be within the United States, and not actually naturalized, shall be liable to be apprehended, restrained, secured and removed, as alien enemies." Here is a broad proposition, standing as a foundation for summary proceedings against persons who are declared to be in the situation of alien enemies. I do not consider, as has been contended by Mr. Lockington's counsel, that the

[ Lockington's Case. ]

apprehending, restraining and securing, here mentioned, are to be intended solely for the purpose of removal out of the United States. It is a provision for the public safety; which may require that the alien should not be removed, but kept in the country under proper restraints; and the nature and degree of these restraints, in cases where there has been no misbehaviour, may depend, in some measure, on the treatment which the hostile government gives to citizens of the United States who may chance to be within its power. The act then proceeds to declare, that "the president of the United States shall be authorized, in any event as aforesaid, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States toward the aliens who shall become liable as aforesaid; the manner and degree of the restraint to which they shall be subject; and in what cases and upon what security their residence shall be permitted; and to provide for the removal of those who, not being permitted to reside within the United States, shall refuse or neglect to depart therefrom; and to establish any other regulations which shall be found necessary in the premises, and for the public safety." Then follows a proviso for securing the observance of treaties, which is not material in this case; because, at the time of the declaration of war, there was no treaty regulating the subject in existence between the United States and Great Britain.

In the second section of the act it is enacted:—"That after any proclamation shall be made as aforesaid, it shall be the duty of the several courts of the United States, and of each state, having criminal jurisdiction, and of the several judges and justices of the courts of the United States, and they shall be, and are hereby respectively authorized, upon complaint against any alien enemy, or alien enemies, as aforesaid, who shall be resident and at large within such jurisdiction or district, to the danger of the public peace or safety, and contrary to the tenor or in-

tent of such proclamation, or other regulations which the president of the United States shall and may establish in the premises, to cause such alien or aliens to be duly apprehended and convened before such court, judge or justice; and after a full examination and hearing on such complaint, and sufficient cause therefor appearing, shall and may order such alien or aliens, to be removed out of the territory of the United States, or to give sureties for their good behaviour, or to be otherwise restrained, conformably to the proclamation or regulations which shall and may be established as aforesaid, and may imprison, or otherwise secure such alien or aliens, until the order which shall and may be made, as aforesaid, shall be performed."

It cannot be doubted, but that the provision in the first section, considered without reference to the second, authorizes the president to establish a regulation that all alien enemies of a certain description, shall retire immediately to a place to be appointed by the marshal; and that, in case of non-compliance, the marshal shall remove them. But the second section, having authorized certain courts and judges, upon complaints made against alien enemies, to have them apprehended and brought before them; and, after hearing, to make such order as may be necessary for carrying the regulations of the president into effect; there is not wanting strong colour for an argument, that the only manner of executing the regulations is by complaint to a court or judge. This is a point well worthy of serious consideration. I have considered it attentively; and I shall give the reasons which have induced me to conclude that, notwithstanding the second section, the president was authorized to make an order for the removal of the alien enemy by the marshal, in the first instance. It is never to be forgotten, that the main object of the law is, to provide for the safety of the country from enemies who are suffered to remain within it. In order to effect this safety, it might be necessary to act on sudden emergencies. It is

[Lockington's Case.]

well known that the United States are exposed to great danger in a war with an enemy who commands the sea. Bounded by the Atlantic ocean to a great extent, with numerous bays and navigable rivers, penetrating the very heart of the country, there is no knowing when, or where, the attack may be made. Without incurring the charge then of undue severity, prudence might require, that alien enemies residing in large cities, should be removed with more expedition than the formalities of law admit. The president, being best acquainted with the danger to be apprehended, is best able to judge of the emergency which might render such measures necessary. Accordingly, we find that the powers vested in him are expressed in the most comprehensive terms. He is to make any regulations which he may think necessary for the public safety, so far as concerns the treatment of alien enemies. It is certain, that these powers create a most extensive influence, which is subject to great abuse: but that was a matter for the consideration of those who made the law, and must have no weight with the judge who expounds it. The truth is, that, among the many evils of war, it is not the least, to a people who wish to preserve their freedom, that, from necessity, the hands of the executive power must be made strong, or the safety of the nation will be endangered.

But, it may be asked, what is the use of the provision in the second section, concerning courts and judges, if the regulations of the president may be executed without resorting to them? The answer is, that the use is great. In the first place, where the marshal is ordered to make the removal, he is at liberty to apply to the judges; and there may arise cases, in which he will find it prudent to strengthen himself by the judicial authority. But, besides, many regulations may be made, which contain no order for the marshal to act, or which may direct him to proceed by way of complaint to the judges. If the regulation in question had simply been, that alien enemies should retire

[ Lockington's Case. ]

to a place to be appointed by the marshal, any citizen might have complained of an alien enemy who declined to comply; and a judge might have made and enforced an order for his removal. There may be various regulations for the general conduct of alien enemies, without pointing out the mode of carrying them into effect; and in all such cases, the courts may take cognizance of them. There may be regulations which barely order that certain things shall be done, or shall not be done, without defining the penalty in case of disobedience. In such cases, the judges to whom complaint is made are vested with a considerable discretion. They may, according to the nature of the case, either direct the alien enemy to be removed out of the United States, or to give security for his good behaviour, or to be imprisoned until the order of the president is complied with. It would be a waste of time to point out all the uses of this provision, respecting the power of courts and judges.. To those who reflect on the subject, many more than I have mentioned will suggest themselves. It is worthy of remark, that in the third section of the act, it appears, that the president may, by his warrant directed to the marshal order him to apprehend any alien enemy, and remove him out of the territory of the United States. Now it is difficult to conceive a reason why the president should be authorized to remove any alien enemy out of the country, without assigning a cause; and yet that he should not be permitted to direct that those of a certain description should repair to a certain place within the United States, and in case of a refusal, that the marshal should remove them. The particular reason assigned by Mr. Lockington for not complying with the order of the president, I cannot but very much regret. But, although it absolves him from the charge of obstinate and perverse disobedience, yet it can have no effect on my judgment, as it is a subject on which I have no power to act. I am not without hopes, however, that this public discussion may bring to the mind

T

[ Lockington's Case. ]

both of our own and the British government, a matter which seems not to have been attended to: that is to say, that persons detained in a foreign land, cut off from their friends, and without the opportunity of pursuing their usual occupations, may be involved in distress which demands relief.

But, supposing the president had power to make the regulation under which the marshal has acted, it is denied that he ever did make it. The act of congress requires, that the president should establish regulations, by his proclamation or other public act. He has made no proclamation; but has he not made a public act? The first order was issued from the department of state, although it does not appear to be signed by the secretary of state, nor is the name of the president mentioned in it. The attorney for the United States says, that the orders of the president are usually communicated in this form. If the matter rested on this notification, I should be somewhat at a loss what to think of it. The president could not transfer his power to the secretary of state; and as there is no mention of his name, some evidence might be necessary, to show that it was really his order issued from the department of state. But the order issued from the commissary general of prisoners puts the matter out of doubt; for the regulations there established, which refer to and adopt the former orders from the department of state, are expressly declared to be the act of the president, although they are not signed by him, but by the commissary. This is sufficient to satisfy me. Being published as the orders of the president, signed by an officer of high trust, and never disavowed, I consider them as the public acts of the president.

I must add a few words with respect to the return to this *habeas corpus*. The writ is directed to Joseph Cornman, keeper of the debtors' apartment of the prison of the city and county of Philadelphia, who made return, that he detained Mr. Lockington by virtue of a written order from

[ Lockington's Case. ]

John Smith, Esq., marshal of this district, by which he was commanded to keep the said Mr. Lockington, who had violated the orders of the president, &c., until he should be discharged by law. Connected with this return, I must take the suggestion presented by the marshal, and verified by his oath; by which it appears that he placed Mr. Lockington in the debtors' apartment, until he could be conveyed or would voluntarily go, to Reading. The marshal's order to the keeper of the prison has, at first view, somewhat the air of a judicial act, for which he certainly can have no authority. But the peculiar circumstances of the United States with regard to prisons, will serve to explain the matter. They have no prisons of their own, and make use of the state prisons, by permission of the several states. Although the marshal held Mr. Lockington in custody in a ministerial capacity, it might be necessary for him to give the keeper of the prison some document to authorize his detaining him; so that I consider Mr. Lockington as, in fact, in custody of the marshal. Being of opinion that the marshal had a right to take him into custody, and place him in the debtors' apartment for safe keeping until he could conveniently be removed to Reading, I must order, that Charles Lockington be remanded to the custody of the keeper of the debtors' apartment.

The prisoner was accordingly remanded.

Subsequently, on the 1st of January, 1814, the prisoner having sued out a new writ of *habeas corpus*, returnable before the supreme court in *banc*, and the case having been elaborately argued during several days, by *Messrs. Hare* and *Condy*, for the petitioner, and by *Mr. Dallas*, for the marshal; the following opinions were delivered:

TILGHMAN, C. J.—Having on a very late occasion delivered my opinion on the authority of this court to issue writs of *habeas corpus*, and also on the authority of the

president of the United States, and the regulations estab-
lished by him by virtue of the "Act respecting alien ene-
mies," I have at present only to refer to that opinion, and
to say, that it remains unaltered. But Mr. Lockington
has brought his case before us in another point of view, on
which it is necessary to decide. He has petitioned this
court to order him to be removed out of the United States,
or to permit him to go of his own accord. I am clear in
the opinion that no part of this petition can be granted.
This court has no power with respect to the removal of
alien enemies, except that which is derived from the act of
congress. And that act authorizes us to proceed only
"upon complaint against an alien enemy, who is resident
and at large within this state, to the danger of the public
peace or safety, and contrary to the tenor or intent of the
proclamation or regulations established by the president of
the United States." But no complaint has been preferred
against Mr. Lockington. He has caused himself to be
brought before us by a *habeas corpus* in order to decide on
the legality of his imprisonment, and although, in the re-
turn to the writ, some facts are stated which might afford
ground for complaint, yet that return is by no means to be
taken as the exhibition of a complaint, but merely as the
setting forth of the causes for which the prisoner is held in
confinement. But, even if we had jurisdiction, I should be
equally clear that the petition ought not to be granted,
because, the president of the United States having estab-
lished certain regulations, within the sphere of his authori-
ty, by virtue of which Mr. Lockington is to be held in
restraint within the United States, we have no power to
contravene those regulations, by ordering him to be re-
moved out of the United States, or by permitting him to
go of his own accord.

YEATES, J.—The argument on this *habeas corpus* has
been conducted with singular ability and depth of research.

[ Lockington's Case. ]

A preliminary question has been raised by the district attorney of the United States, that, as a state court, we have no jurisdiction of the case before us. Upon this point, I feel no doubt or difficulty whatever.

It is candidly admitted, that in all cases where a person is restrained of his personal liberty, and the court or judge have the slightest doubt of the legality thereof, they ought, upon a proper allegation made to them, to award a writ of *habeas corpus.* Here, Charles Lockington has been deprived of his liberty, and is in actual confinement in the debtors' apartment of the prison of the city and county of Philadelphia. He complains of his imprisonment, as illegal, and demands a hearing. This court and each member of it, in vacation, have authority to allow a writ of *habeas corpus,* as well at common law as under the express terms of our act of assembly of the 18th February, 1785, which directs, "that where any person not being committed or detained for any criminal or supposed criminal matter, shall be confined or restrained of his liberty, under any colour or pretence whatever," he shall have such writ. Admitting, in its fullest extent, the judicial power of the United States to extend to all cases in law or equity arising under the constitution, the laws of the United States, and the treaties made under their authority, it does not follow, that the jurisdiction of the state courts in such instances is abolished. They are necessarily called upon to determine, in many cases, the true construction of the constitution, the laws of the United States, and treaties made under their authority. But the ultimate decision in these instances is secured by law to the supreme court of the United States. It is declared, by an amendment to the constitution of the United States, that the powers not delegated thereby to the United States, nor prohibited by it to the states, are reserved to the states respectively, or to the people. No act of the general government has attempted to take away the right of the state courts in the particular under consi-

[ Lockington's Case. ]

deration; and it is of the utmost importance to the citizens and other inhabitants of every state of the union, that a speedy hearing should be secured to them in all cases of restraint of their personal freedom. The true interests of the individual sovereignties composing the union, and, in truth, of the union itself, are inseparably connected with the independence of the judicial tribunals of the several states. Imperious duty enjoins on the state courts, not to surrender up their right of issuing writs of *habeas corpus*, unless on the clearest conviction that they have no just claim thereto.

The return by John Smith, the marshal, to this writ is of a very special nature. It states the act of congress declaring war against Great Britain, the president's proclamation, the president's directions of the conduct to be observed by the United States towards alien enemies, and more especially that of the 23d February, 1813, setting them out, that Charles Lockington reported himself to the marshal as an alien and British subject, and applied for a passport to retire to Lancaster, which was afterwards changed to Reading, at his own request; and that after the marshal's designation of Reading, he found Lockington in Philadelphia, and directed and required him to repair to Reading, which he refused to do, and thereupon he took him into custody, and placed him for safe keeping in the debtors' apartment, until he could be conveyed, or would voluntarily go, to Reading, or should be otherwise discharged according to law; that Lockington sued out a *habeas corpus*, returnable before the chief justice, and was remanded upon a hearing, and afterwards brought an action of trespass and false imprisonment against the marshal, but refused to execute a parole of honour which was tendered to him; that Lockington had, on several occasions, since the president's proclamation, grossly abused the indulgence and hospitality of the United States, by declaring his adherence to the enemy, and his disposition

[Lockington's Case.]

to support their interest, and by aspersing the character and conduct of the government and people of the United States; and that when Lockington was taken into custody he was resident and at large within the district of Pennsylvania, to the danger of the public peace and safety, &c.

The question before us is, whether a legal and sufficient cause for the imprisonment of Charles Lockington has been shown to the court.

The contest arises on the words of the act of congress, passed the 6th of July, 1798, "respecting alien enemies." The first section thereof provides, that "in the event of a war or invasion, and the president of the United States shall have made public proclamation thereof, all natives, citizens, denizens or subjects to the hostile nation or government, being males of the age of fourteen years and upwards, who shall be within the United States, and not actually naturalized, shall be liable to be apprehended, restrained, secured and removed as alien enemies. And the president of the United States shall be, and he is hereby authorized, in any event, as aforesaid, by his proclamation thereof, or other public act, to direct the conduct to be observed, on the part of the United States, towards the aliens who shall become liable, as aforesaid; the manner and degree of the restraint to which they shall be subject, and in what cases, and upon what security, their residence shall be permitted; and to provide for the removal of those who, not being permitted to reside within the United States, shall refuse or neglect to depart therefrom; and to establish any other regulations which shall be found necessary in the premises, and for the public safety, &c."

Here it is objected, that although war has been declared against Great Britain, and the same has been proclaimed by the president of the United States, yet he has neither by his proclamation or other public act, given the directions, or established the regulations required by the law; and that such directions and regulations being in the nature

[ Lockington's Case. ]

of public laws respecting the conduct of alien enemies in general, ought to have been solemnly authenticated under the national great seal. That the notification made on this occasion produced the effect designed thereby, is ascertained by the fact, that the British alien enemies resident among us actually reported themselves to the marshal. If the act has been done in the usual and accustomed manner in which the communications of the president of the United States have been made in other cases wherein such duty has been enjoined on him, it would appear to me to be a sufficient public act within the meaning of the law. These public acts issued from the department of state, founded on the president's instructions, and were made known through the medium of the same newspapers in which the laws of the union were promulgated. We find the president was authorized to establish regulations under the embargo laws of 1794 and 1807: and the communication thereof was made by the secretary of the treasury. So, also, where the president was empowered to borrow money on loan. In like manner, where the authority was given to him to extinguish the lights on the sea coast: and so in other instances, which were cited on the argument. To civil commissions, the great seal is necessary by the law of the 15th December, 1789; but it is not to be affixed to other papers unless directed by the president of the United States. Proclamations are not always under the great seal. Added to the different letters from the secretary of the department of state, under his own signature, to the marshal, containing his official instructions, several letters have been produced from John Mason, Esq., commissary-general of prisoners, including the superintendency of alien enemies, a known officer in the execution of his duty, which refer to the publications of the department of state, as founded upon the immediate act of the president of the United States. On this point, therefore, I am of opinion, that the president, by a public act, has given the

[ Lockington's Case. ]

directions, and established the regulations enjoined on him by the law of the 6th of July, 1798.

But the great difficulty of the case remains still to be considered. Was the imprisonment of Charles Lockington, by the mere act of the marshal alone, under his instructions, legal, without calling in the aid of the judicial authority? It is a question of great moment, inasmuch as it deeply interests the national welfare, and all that class of alien enemies which falls within the president's regulations, and therefore demands the fullest investigation.

I will assert at once, that I consider Charles Lockington, although an alien enemy when the war was declared, yet, as resident among us at that period, entitled to certain rights, until he has forfeited them by some offence cognizable by the laws of war. I do not view him as a prisoner of war, subdued and forcibly brought into the United States. And it is observable that under the letter of the 15th April, 1813, from the secretary of state to the marshal, that the superintendency of alien enemies is annexed to Mr. Mason's character as commissary general of prisoners, so that they are distinct offices, though united in one person.

I regard the true meaning of the law of the 6th of July, 1798, to be collected *ex viceribus suis*, as the only correct ground of decision thereon. It is of no moment, in my idea, how it was treated by different gentlemen on the floor of congress, or to what political party they belonged. It has passed into a law in the form in which we find it in the statute book. As such, we are compelled by every tie of duty to execute it, even although we should suppose it to infringe, in some instances, the ancient or modern codes of the law of nations.

The great, prominent feature which is exhibited to our view in every part of this law, is, that its provisions were made for the public safety; and although " the dictates of humanity and national hospitality " were not unattended to, their extent was limited to the *salus populi*.

[ Lockington's Case. ]

The first section I have already recited. The president of the United States was thereby empowered to establish *any* regulations which should be found necessary for the public safety. Persons of a certain description were liable to be apprehended, restrained, secured and removed, as alien enemies, under the president's directions. Their residence therefore might be restrained to certain distances from the tide water, according to the president's idea of probable impending danger to the community at large. The means of effectuating the primary object of *ne quid detrimenti capiat respublica*, must necessarily be supposed to be given; and if the alien refused or neglected to repair to the place of residence appointed by the marshal, under the president's directions, the marshal might secure and remove him. The terms of this section taken by themselves and independently of the succeeding section, would warrant a confinement by the marshal, for the purposes of removal.

The words of the second section are contended to have restrained the general import of the preceding clause. It is thus expressed: " After any proclamation shall be made as aforesaid, it shall be the duty of the several courts of the United States, and of each state, having criminal jurisdiction, and of the several judges and justices of the courts of the United States, and they shall be, and are hereby respectively authorized, upon complaint against any alien or alien enemies, as aforesaid, who shall be resident and at large within such jurisdiction or district, to the danger of the public peace or safety, and contrary to the tenor or intent of such proclamation, or other regulations which the president of the United States shall and may establish in the premises, to cause such alien or aliens to be duly apprehended and convened before such court, judge or justice; and, after a full examination and hearing on such complaint, and sufficient cause therefor appearing, shall and may order such alien or aliens to be removed out of the territory of the United States, or to give sureties of

[ Lockington's Case. ]

their good behaviour, or to be otherwise restrained, conformably to the proclamation or regulations which shall and may be established as aforesaid, and may imprison, or otherwise secure such alien or aliens, until the order which shall and may be made, as aforesaid, shall be performed."

It is urged, that a marked line has prescribed the manner in which the regulations of the president should be effectuated, and that the powers granted to the courts, judges and justices are fully competent to carry the president's directions into complete execution. It is asked, shall the marshal execute instructions in the nature of a general warrant, without revision or control? And what ground of jealousy can be entertained against courts and judges who openly administer the justice of the country according to known rules? The dangers to be apprehended from the conduct of ministerial officers in executing such general directions have been depicted in vivid and glowing colours.

When the vessel of the commonwealth is in danger, partial evils must be submitted to, in order to guard against a general wreck. Aliens who have come among us before a declaration of war against their sovereign, and continue to reside among us after it, cannot expect an exemption from such evils. Should our country be invaded, or our coasts blockaded, common prudence suggests that such persons should be removed from the scene of action. They may be safely detained, without subjecting them to unreasonable hardships, until it can be ascertained what course of conduct will be observed by the hostile country towards our own citizens resident there. The " law's delay " would ill suit such removals in cases of sudden emergency. To suppose that alien enemies might be wantonly sent to the head waters of the Missouri or an uncultivated wilderness, by the president of the United States, or by the marshals of the federal courts, is to put extreme cases, which no reasonable man will presume. But the president and every

executive officer of the union are responsible for the abuse of their authority; and, I may confidently assert, from my experience in life, that, in this government at least, where a public officer has been guilty of oppression in office, he never has escaped with impunity, when an appeal has been made to the justice of the country.

The reason of introducing the second section into this law, appears to me to be by way of aid to the general measures of the government, and that the judicial authority is made auxiliary to the executive. It extends only to alien enemies who shall be resident and at large, to the danger of the public peace and safety, and contrary to the tenor of the president's regulations. Such persons may be apprehended by the orders of the several courts of the United States, and of each state having criminal jurisdiction, and be dealt with conformably to such regulations. The aid of the judicial authority will always be found of great moment to the marshal in the execution of his official duties. It conduces to the public security, that such suspected person may be convened before a state court, as well as the several courts, judges and justices of the United States, to answer the complaint made against him by the marshal, his deputies, or any individual. It would be deemed oppressive in the highest degree, if the party accused was to be brought before the district judge of the United States, in this city, to answer a complaint made against him in the extreme parts of the state. The witnesses in support of the prosecution would also be thereby subjected to great difficulties.

I therefore consider the true construction of the act in question to be, that the marshal may legally enforce the directions of the president, communicated by the proper departments, without being under the necessity of recurring to the judicial authority for that purpose. By section third, he may remove an alien out of the territory of the United States under the warrant of the president; and under his

[Lockington's Case.]

regulations he may be removed to a place in the interior, where less danger may be apprehended from him. It is not left to us to decide on the expedience of such a power being vested in the marshal, or avert the dangers which may result therefrom to the personal liberty of individuals. The law is bottomed on the great principles of self-defence and self-preservation; and if mischiefs arise therefrom, the legislature of the union is alone competent to apply a remedy.

The question before us is not whether, if Mr. Lockington had, in the first instance, elected to leave the territory of the United States, he would not have been entitled thereto, unless he had been charged with actual hostility, or other crime against the public safety, or some strong and cogent reason could be shown to the contrary; it is, whether, after having reported himself as an alien enemy under the regulations of the president, and his place of residence changed at his own request from Lancaster to Reading, he is not liable to be confined until his removal to the place of designation can be effected? I am of opinion that the imprisonment of his person by the marshal on the ground of his refusal to go to Reading, was justifiable under the act of congress, and that we cannot relieve him from his confinement. His want of pecuniary means to remove himself to Reading, may excite our sympathy, but cannot change our decision.

I concur that he be remanded to the debtors' apartment.

BRACKENRIDGE, J.—I will acknowledge that it is not an easy matter, to say what construction shall be put upon this act of congress, entitled, "An act respecting alien enemies:" whether the executive of the general government shall be confined to the ascertaining and declaring such reasonable time for the departure of this description of persons from the United States, "as may be consistent" with the public safety; and according to "the dictates of

[Lockington's Case.]

humanity and national hospitality," no treaty having existed stipulating for a certain period: and whether, after having ascertained and declared such reasonable time, the executive of the general government was authorized merely " to direct the conduct to be observed on the part of the United States," towards this description of persons, who should remain in the country after such time; and that it shall lie with the judicial power to apply such directions to the particular case.

It cannot but have some weight, in a dubious case, to see what has been the construction put upon this act by the executive of the general government who has been intrusted, at least to some extent, with the carrying this act into effect. The construction the executive of the general government has put upon it is discoverable from the manner in which it has acted upon it, and the measures adopted in carrying it into effect. But considerations of policy, in the construction of an act, must at all times have weight.

Will it be contended that the judicial power is the only medium through which an alien enemy can be apprehended, &c., and this on complaint made? In that case, it being left to the interference of individuals, little would be done. It is odious to inform, and unless imposed as official duty, who would like to do it? It would be too much to expect from the mere impulse of patriotism such exertions for the public safety. Would it not seem too narrow a construction of the act of congress, and tending to defeat the object of the law? If so, I would consider the judicial power as auxiliary only to the authority of the executive of the general government, and no more. The auxiliary aid of the judicial power is consistent with the executive power of the general government in apprehending, &c. But the authority of the judicial power to judge of what the executives of the general government have done in the exercise of their authority according to the law of nations, or under the act of congress, is inconsistent with the right of the

executive to judge in the last resort, or to act in the first instance. Every court of every state competent to issue a *habeas corpus*, may impede the acts of the executive of the general government, in the exercise of its power.

"*Quo capitum totidem stadiorum millia.*"

A thousand inner wheels will counteract the outer, and the machine will stop. The interior gyrations will not correspond with the exterior in a geometrical problem; or, as we say, in mathematical science, the interior circles will not be parallel with the exterior. No machine can be constructed that would move on such a principle. For the supreme court of the United States can have no control over the concurrent acts of the several courts by way of appeal, in this case. May it not therefore be inferred that it could not have been intended under the act of congress to give the judicial power, either of the courts of the United States or of the state courts, more than an auxiliary jurisdiction?

Hence, the question in this case will be, can the judicial power do more than what is auxiliary, and interfere on behalf of an alien enemy, to take him out of the custody of the executive of the general government, on the ground of being " apprehended, restrained, secured, or removed," unreasonably and without just cause, or oppressively in the particular case? I consider alien enemies, so apprehended, &c., as coming under the denomination of prisoners of state, not for any offence against the state, but for reasons of state; it being necessary for the safety of the state that they should be so apprehended, &c. Having not been taken in battle, I cannot call them prisoners of war, for they are not liable to be exchanged. But what else can they be considered, when apprehended, but as prisoners to some extent? By this act, entitled, " An act respecting alien enemies," the president would seem to be constituted as to this description of persons, with the power of a Roman dictator or consul, in extraordinary cases, when

[ Lockington's Case. ]

the republic was in danger, that it sustain no damage: *ne quid detrimenti respublica capiat.* Are we not excluded, in such case, by our *habeas corpus* act, which is the same with that of the constitution of the United States, art. 4, § 2. " A person charged with a breach or violation of the law of nations," is not the subject of a *habeas corpus.* Alien enemies remaining in our country after a declaration of war, are to be treated according to the law of nations, and it has been so argued in this case. Shall then the judicial power constitute itself a judge between the executive of the general government and the nation with whom we are at war, and say, whether the proceeding in the case of their subjects remaining in our country has been according to the law of nations?

There is the same reason that the municipal judiciary shall not interfere with the general executive, as where the individual is charged with a breach or violation of the law of nations. In a case of alien enemy, I do not therefore see how this state court or the court of the United States, can undertake to say whether the proceeding of the executive of the general government has been regular or irregular, according to the law of nations in the case, or according to the act of congress; of which, it must be supposed, they are the judges, and responsible only to the body politic of the union for the construction of their statute.

A report has been read from a gazette, of a decision of a court of the United States, Chief Justice Marshall and Judge Tucker composing that court,—great names, and in high station. This report, if correct, carries with it evidence that the executive authority was warranted in apprehending, &c., without the intervention of the judicial power. It carries with it evidence also that this court did undertake to review and set aside the acts of the marshal, at least, under a *habeas corpus*, on behalf of one apprehended and restrained by him. This was on the ground of not appointing a place to which the prisoner was to be re-

moved. The exercise of this power would seem to imply, that it was competent to them to judge also of the *locus in quem*, or the place to which the alien enemy was to be removed. It might be an unwholesome fen, or dismal swamp, a barren mountain, an unpeopled country, a remote district, a Siberian wilderness. Might not such consideration be extended also upon the same principle to the nature of the society to which the alien was to be removed, or the *locus in quo* as unsuitable for the employment of the alien in his accustomed occupation or art, so as to be able to obtain the means of subsistence, or otherwise? If such latitude could be taken by the courts, what hindered to have reviewed the whole proceedings of the general government, *ab initio*, and to have begun at the bottom, or first act, in relation to alien enemies? To have inquired as to the executive having given notice and a reasonable time to alien enemies to depart from the country before it had proceeded to apprehend, &c.?

It is true, it is not enjoined that the president *shall* give notice by proclamation or other public act, the word *may* being used; but was it not a *sine qua non*, an act without having done which a step could not be taken in apprehending, &c.? This would seem to be a reasonable construction, and that it was not until after such proclamation, or other public act announcing this, such description of persons remaining in the country after such limitation of time, were bound to consider themselves as liable to be apprehended, &c. Were I to take any ground in the case, it would be this; for I do not see any declaration or public act of the government announcing such time, after which alien enemies choosing to remain were to consider themselves as existing—that is, remaining—in the country by the courtesy of the government, and subject to all the regulations, restrictions and directions which might be made by the government respecting them. But I do not see that the courts of the United States have the power to interfere

on any ground, on behalf of such description of persons. The courts of the United States have no more power than this court has to inquire into the regularity of the proceedings on the part of the executive of the general government, with regard to this description of persons. The return of the marshal that he holds an applicant as an alien enemy, in other words, a British subject, for that is the only nation with whom we are at war; and the admission by the applicant that he is of such description of persons; no traverse tendered as to his not being such, exclude, in my opinion, the interposition of this court, or of any other court. This redress against any undue proceeding of the executive, or of any officer acting under the appearance of that authority, must be through the department of state to the president himself.

I have no idea that if the alien enemy had violated a municipal law, and had been arrested for that offence, and was in custody under process from any municipal court, the president could interpose to take him out of custody, or to send him out of the country. For the alien enemy is not out of the law so far as to claim protection from the law against trespasses; or so far as not to be liable to prosecutions for trespasses done by him; but so far as to preclude interposition between him and the general government. I think he is to be considered as out of the municipal law, and not the subject of a *habeas corpus* in that case. We are *imperium in imperio*, and I do not think our judicial power extends to impede the march of the general government, but is confined to what is auxiliary, and cannot control. It will be understood that I mean the case of a person in custody under the denomination of a British subject; and who admits himself to be of that description of persons, and to be in confinement as such. I do not see that any *habeas corpus* can issue, unless the applicant can make an affidavit in the first instance that he is not an alien enemy, or, in other words, a British subject,

*flagrante bello* with that nation. It wholly belongs to the general government; and, on a representation to the executive, through the department of state, it cannot but be presumed by the judicial power, that in the case of any undue proceeding against an alien enemy, relief will be given. It would introduce endless confusion and embarrassment to say that the judicial power can at all times interfere between the alien enemy and the general government, so as to take him out of their hands, on an allegation that he was treated with inhumanity or hardship. The only thing that is alleged, or can be alleged is, the not having given notice, a reasonable time, to depart. I do not see that this step has been taken in the first instance; if it had, there could not a word more be said. This, however, will be a consideration with the executive, who is responsible to the nation for every thing that an alien could claim.

As to the taking up of this case on the score of a complaint made to the judicial power, so as to make any order, the alien enemy is not at large, which is the term in the act of congress; and it is only in such case that the judicial power is warranted in apprehending, &c., so as to make an order to remove. We have not the power, not even if the marshal was to half strangle, instead of half starve, the prisoner: for the marshal is the president, and what he does must be considered the act of the executive. At the same time, I must remark, that we have no evidence of half starving, or of any other hard usage, but the contrary. It is on a complaint against him that the court can interfere; not on a complaint for him. The marshal makes no complaint against him. He stands upon his bond, and says he has him in custody. Can we take him out? I think we cannot.

To sum up what has been said in a desultory manner, the first step which, it seems to me, it behooved the executive of the general government to have taken under the act of congress in question, was the promulgation of the

reasonable time for the departure of alien enemies, six months having been given by the act of congress of the 6th July, 1812, " within which passports for the safe transportation of any ship, or other property, belonging to British subjects, then within the limits of the United States," this might have been supposed to have been the limitation for the departure of persons also. But a distinction exists, and was to be taken between property in persons. There ought, in strictness, to have been a proclamation, or some public act, limiting the time as to these, after which they should consider themselves as liable to be apprehended, &c.; and this not appearing to have been done, doubtless on a representation to the president now, through the department of state, by any of those willing to remove, they will obtain permission to depart, so that there can be no necessity for the courts to interpose, if they had the power: but it is my opinion they have not. It is on complaint made, that the courts are warranted to act; meaning, I take it, the same with information given, that any alien enemy, contrary to the tenor and intent of such proclamation, or other regulations which the president of the United States shall and may establish in the premises, that the courts shall cause such alien or aliens to be duly apprehended and convened before such court, &c. But in order to be effectual for the great mass of his operations for the exigencies of the public safety, the executive must be considered as having a right to act in the first instance. It is on proof of improper and suspicious conduct, that the alien is to be informed upon, or complained against, to a court or judge, and, sufficient cause appearing, that measures may be taken by this functionary of administration. But the president is not confined to examination in the individual case, and sufficient cause appearing, in prevention of what may be done by aliens, the president may order off or cause to be removed out of the country, or confined within it, and this simply on the ground of not having de-

[ Lockington's Case. ]

parted agreeably to proclamation, or removed agreeably to regulations. I state this, the necessity of giving the act this construction, as justifying the president, by his marshals, acting independently of judicial functionaries, and not subordinate to them. And for this reason, I am confident in my opinion, that the privilege of the *habeas corpus* does not extend to an interference with the proceedings of the executive authority in such case. Did I not think so, I would consider myself bound to liberate on the ground of the first step not having been taken, the giving notice; where the *requisitus* is not shown, and this not matter of form, but matter of substance in any case, a judicial proceeding cannot be supported, but the plaintiff must be nonsuit. But it may be said, that the calling on alien enemies to report themselves to the marshal was notice. But this was forthwith, and does not imply a time preceding. But this is a matter the responsibility of which lies to the nation, and with foreign nations, and not with the judicial power under this act. At the same time, I must say, that I cannot suppose any of those remaining in the country would have removed, had notice of reasonable time been given. The president had taken it for granted that all had removed within the six months, with their effects, that chose to go, and it is matter of form only, that is complained of in this case. But of that I do not deem it competent for a judge or court to determine. It must lie with the executive, and not the judicial power.

The prisoner was accordingly remanded.