# Rice's Appeal.    Ahl's Appeal.

1. A corporation issued bonds payable to bearer and secured by a mortgage on its property, franchises, &c. The directors authorized Jones to raise money for the corporation and delivered bonds to him as collateral for money he might raise. He borrowed money on his own note, pledged bonds to the lender and applied the money for the company's use. The property, franchises, &c., of the company were sold under the mortgage. In distribution of the proceeds : *Held*, that the lender was not to receive the full amount of the bonds and account to Jones, but that he was entitled only to his loan and interest.

2. Ahl sold land to the company ; as part of the consideration he was to receive bonds secured by a second mortgage to be issued ; he delivered the deed ; judgments were confessed by the company, after which the mortgage was executed. The bonds were tendered to Ahl ; he refused them because of the judgments ; the bonds were then otherwise appropriated by the company. *Held*, (1.) That the setting apart of the bonds to Ahl gave him no claim for their amount in the distribution ; (2.) That in the distribution it

was a question of lien and Ahl had no lien ; (3.) The mortgage having been given to secure the bonds and Ahl not owning them, he had no lien equitable or legal through the mortgage for the purchase-money for which the bonds were to be delivered to him.

3. After Ahl's rejection of the bonds, he had no further claim on them; the company could dispose of them as they pleased. He had only a right of action against the company for the purchase-money.

4. Ahl and Jones projected and organized the company, in order that Ahl might sell his lands to the company and Jones build a railroad for them. They owned most of the stock, controlled the corporation absolutely, and co-operated with each other in selling the land and contracting for building the road. *Held*, that the burden was on them to show the fairness of the transactions.

5. Promoters, directors or agents of a company are not permitted to make profit out of it in buying lands or dealing with it.

6. Under the facts in this case, *Held*, that the sale of this land by Ahl to the company was fraud in fact and in law.

7. Where a surety, or one standing in that position, for the payment of a debt, receives security for his indemnity or to discharge such indebtness, the principal creditor is entitled to the security although he may not have given credit on the faith of it or known of it at the time.

June 2d 1874, at Harrisburg. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Appeal from the decree at Nisi Prius. In Equity. Of January Term 1873. In the distribution of the proceeds of trustees' sale of The Southern Pennsylvania Iron and Railroad Company.

On the 22d of March 1867 an Act of Assembly, authorizing the incorporation of the Caledonian Iron and Railroad Company, was passed. The capital was to be $300,000, with power to increase it to $500,000, in shares of $100 each, or to such an amount as might be "necessary to the full and complete operation of the company." The number of directors to be nine. A director might be an agent or officer with a salary. The company was authorized to hold 16,000 acres of land, with power to mortgage, sell, &c.; to mine, manufacture and prepare for market, timber, coal, iron-ore, &c.; sell the same, &c. Also, to construct and operate a railroad, or railroads with branches to connect with any railroad "now or hereafter to be built." Also, to be subject to the provisions of the General Railroad Law of February 19th 1849, and its supplements. The stock might be paid for in real and personal estate, "at a bonâ fide valuation to be agreed upon by a majority in interest of the subscribers and stockholders." The company might issue coupon bonds at an interest not exceeding 7 3-10th per cent. per annum, and sell them at their "market value." A supplement of April 10th 1867, amongst other things, authorized the purchase of 4000 additional acres of land, directed the mode of organizing the company, &c. A meeting for receiving subscriptions was held May 16th 1867, and 870 shares of stock were subscribed. Amongst others, D. V. Ahl subscribed for one hundred shares; most of the other stock was subscribed for by Ahl for the other persons in whose names it was taken. Another meeting was held June

12th 1867, and some further steps taken towards organization; after which the project was virtually abandoned.

D. V. Ahl was an iron-master, and with his brother, P. A. Ahl, owned iron land in Franklin county, in the vicinity of the projected road, the title generally being in the name of D. V. Ahl. Some land was purchased by him afterward, and about March 21st 1868 he had about 5000 acres. After some efforts by D. V. Ahl, with a view to selling his lands and building a railroad, which were not successful, the subject came to the knowledge of Richmond L. Jones, Esq., of Reading, and after some correspondence, he and D. V. Ahl had a conference with reference to it, on the 23d of November 1868. A plan was proposed, of which a written memorandum was made. It was: to organize a company with $800,000 capital, to which were to be transferred the charter and stock of the Caledonia company; Ahl to convey his lands, about 5000 acres, to the company for $50,000 in money, $50,000 in the bonds of the company, and $50,000 in capital stock. Jones and his associates to pay into the treasury $450,000, of which $50,000 were to be paid to Ahl for the land, and $400,000 applied to the construction of a railroad from the land to Chambersburg, or some more expedient point. Jones and his associates to receive for their advance $450,000 in the bonds of the company and $450,000 in its capital stock. In the memorandum it was declared that it was not to be binding as an agreement. There was much correspondence between Ahl and Jones, in which secrecy as to their plans was enjoined by Ahl and assented to by Jones. Ahl having informed Jones that the charter of the Caledonia Company could be obtained, they agreed that the enterprise should be carried on under it, and, as the master found, they entered into it "for their individual profit, using the machinery of the corporation for the purpose." It was at first supposed that the railroad to be built would be eighteen miles long. It was afterwards ascertained that it would be twenty-four miles. About January 1869, the plan stated in the memorandum was changed, and it was then arranged that the quantity of land to be conveyed by the Ahls should be increased to 10,000 acres; that Jones and his associates were to receive for the construction of the road $625,000 in stock at 50 per cent., and $625,000 in the bonds of the company at 50 per cent.; the Ahls to be paid for the 10,000 acres, including stock and personal property, $200,000 in stock at 50 per cent., and $200,000 in bonds at 50 per cent.

A supplement to the act of incorporation of the Caledonia company was passed February 20th 1869; it authorized them to issue bonds to be secured by mortgage on their lands, railroads, franchises, &c., to purchase lands and personal property and pay for them in stock, to be credited as full paid; to change the name of the company, to purchase the stock theretofore issued, to sell or cancel it, as the directors might order. A meeting of the com-

pany was held February 25th 1869; the whole number of shares then taken was 911; Ahl owning 420 shares and three others owning 40 shares were at the meeting. The supplement of February 20th 1869, was accepted, and four directors, of whom James McCarty was chosen president, were elected; neither D. V. Ahl nor R. L. Jones were elected directors.

At a meeting of the directors March 5th 1869, a contract was entered into with Jones by which he contracted to construct a railroad from a point on the Cumberland Valley Railroad, between Chambersburg and Greencastle, to Mercersburg, and thence to a point on the land of Ahl, near Mt. Pleasant Furnace, for which he was to receive $625,000 in stock and $625,000 in first mortgage bonds of the company intended to be issued, Jones to give security in $200,000 for the performance of the contract, and if the security was not entered in ninety days, the contract to be void.

Another supplement to the act of incorporation was passed April 30th 1869, which changed the name of the corporation to the Southern Pennsylvania Iron, Land and Railroad Company; all the rights, franchises, &c., and the restrictions, &c., of the Caledonia company to continue, the obligations, &c., of the company not to be affected; subscriptions to the stock to be recovered in the new name; this supplement was accepted May 1st 1869. On the 24th of December 1869, under the Acts of Assembly and by authority of a resolution of the stockholders, the directors resolved to issue coupon bonds of the company to the amount of $625,000, payable on the 1st of March 1900, with interest at seven per cent. per annum, payable semi-annually, and secure them by a mortgage in trust to J. Edgar Thomson and Frederick Watts, on their railroad, rolling stock, real and personal estate, &c., and corporate franchises. A mortgage was made accordingly on the 1st of March 1870. On the same day the company entered into an agreement with the Cumberland Valley Railroad Company, by which the latter agreed to lend them $300,000, to be advanced *pari passû*, with the amounts expended by the Southern Pennsylvania Company upon the road, and in instalments not exceeding ten per cent. per month, the loan to be secured by the first mortgage bonds of the company, they to deliver to the Cumberland Valley Company 2000 tons of railroad iron. By the same agreement they leased their road, when completed, to the Cumberland Valley Company for 199 years. On the 23d of July 1870, the directors authorized the further issue of bonds to the amount of $200,000, at seven per cent., payable semi-annually in gold, on the 1st days of March and September, the principal payable on the 1st of September 1880, to be secured by a mortgage on the company's property and franchises to John Rice, trustee. A mortgage was made accordingly, with the proviso for the sale of the mortgaged property in case of default of the payment of interest or principal. The railroad was completed about October 1st 1871,

[Rice's Appeal.]

accepted by the Southern Pennsylvania Company, and passed into the hands of the Cumberland Valley Company under the agreement of March 1st 1870.

Default having been made in the payment of the interest, Rice, the trustee, and certain second mortgage bondholders as plaintiffs, filed a bill in equity in the Supreme Court against the Southern Pennsylvania Company and others, judgment creditors. One of the prayers was for a decree directing the sale of the mortgaged premises and distribution of the purchase-money, the sale not to divest the lien of the first mortgage nor the contract and lease with the Cumberland Valley Company, but the purchaser to take subject to them. A sale was decreed in accordance with the prayer.

Rice, the trustee, was allowed by the court to purchase at the sale ; the property was struck down to him at $305,000 ; the sale was confirmed January 4th 1873 ; his bid by leave of the court was transferred to J. Edgar Thomson, and the deed was made to him. On the same day Charles H. T. Collis, Esq., was appointed master to distribute the fund; the court directed the fund to be invested.

The master sat on the 20th of January 1873, and on a number of days subsequently.

He reported that the trustee submitted a statement charging himself with $305,000, and claimed credit for his own commissions, counsel fees and other expenses amounting to $12,871.50 ; he agreed also that he should be charged with interest at 6 per cent. on $305,000 from the 27th of January 1873.

The claims presented to the master were :—

| | |
|---|---:|
| Augustus F. Boas—Judgment in Franklin county, No. 203 to August Term 1870, entered June 9th 1870, with interest and costs | $32,894.32 |
| Farmers' National Bank of Reading—Judgment in Franklin county, No. 204 to same term, entered June 9th 1870, with interest and costs | 32,894.32 |
| Same bank, Reading Savings Bank and Bushong & Brothers—On ninety-seven second mortgage bonds | 97,000.00 |
| Coupons on same, due September 1st 1871, March 1st and September 1st 1872, with interest ; and three months twenty-two days' interest, due on each in addition | 12,771.24 |
| Henry M. Keim—on three like bonds | 3,000.00 |
| Coupons for same time | 188.13 |
| Kensington National Bank—on sixty-five like bonds | 65,000.00 |
| Coupons for same time | 8,536.57 |
| Allegheny National Bank—on ten like bonds | 10,000.00 |
| Coupons for same time | 939.68 |
| John Rice—on twenty-five like bonds | 25,000.00 |
| Coupons for same time | 2,347.87 |
| Same on judgment in Franklin county, No. 23 to August Term 1872 | 125,000.00 |

[Rice's Appeal.]

The several parties interested in the ninety-seven bonds, claimed to hold them for the following items of indebtedness against the Southern Pennsylvania Company :—

Farmers' Bank of Reading—Two notes of R.·
  L. Jones, endorsed by J. McCarty, for
  $15,000 each, dated respectively, September 25th and October 5th 1871   .     .                                    $30,000.00
Bushong & Brother—Note, dated August
  30th 1871, of J. Glancy Jones and J. McCarty to R. L. Jones, and endorsed by him   $22,600
Note, dated October 16th 1871, of the South
  Pennsylvania Company, endorsed by McCarty, J. G. Jones and R. L. Jones ; guarantied by Bushong & Brother to J. A.
  Althouse    .     .     .     .     .     .     15,120
Note, December 16th 1871, R. L. Jones to
  H. Maltzberger, and endorsed by him    .          250
                                                            ————          37,970.00
Reading Savings Bank—Note of company,
  dated July 20th 1871, to R. L. Jones, endorsed by him    .     .     .     .     . $5,806.91
Note of company dated October 17th 1871
  to R. L. Jones, endorsed by him .     .     5,000.00
Note of company, October 20th 1871 to R.
  L. Jones, endorsed by him .     .     .     2,669.07
                                                            ————        $13,575.98

The bonds and coupons were payable in gold.

Daniel V. Ahl claimed to be the owner of eighty of the above bonds with coupons for the same time, which he alleged had been delivered to Messrs. Kennedy & Stewart for him in pursuance of an agreement with the company, of June 4th 1870, and which had been returned to the company without his consent.

On the 7th of December 1869, D. V. Ahl entered into an agreement with the Southern Pennsylvania Company, reciting the execution of a deed to the company of twenty tracts of land of even date; that Ahl had placed the deed in the hands of John Evans in escrow, to be delivered upon the condition that the company should give their judgment bond for $50,000, payable May 1870, the bond to be delivered to Evans on the 11th of same December; also, on or before the 1st of May 1870, to deliver to Evans $130,000 of the stock and $130,000 of the bonds of the company, the bonds to be paid by one-third of the company's profits annually, and at all events to pay him $10,000 annually, with a right to Ahl, in case of default by the company, to enter, mine, &c., with other stipulations not necessary to refer to.

On the 4th of June 1870, the company, acting by Richmond L.

Jones, their attorney in fact, entered into an agreement with Ahl, by which the agreement of December 7th 1869 was cancelled, the company giving as the consideration $50,000 in cash, $50,000 of the first mortgage bonds, and eighty bonds of $1000 each, to be secured by a second mortgage; Ahl to have exclusive use, &c., of the furnace, &c., " as though he had obtained the same by lease, until the 1st day of April 1871," and upon the surrender of the lease, the company to buy at an appraised value all the personal property on the premises. The deed to the company was delivered. The money was paid, and the first mortgage bonds were delivered to Ahl, on or about June 4th 1870; on the 28th of the next November the treasurer of the company sent the eighty second mortgage bonds to Kennedy & Stewart, their solicitors at Chambersburg, to be delivered to Ahl; they notified Ahl that they would deliver them to him upon his giving a receipt for them. He declined to receive them, on the ground that they were third mortgage bonds, by reason of the entry of the judgments before mentioned in favor of Boas and the Farmers' Bank of Reading, complaining that the entry of these judgments was a violation of the agreement. Upon his inquiry, Mr. Kennedy told him the judgments could not be satisfied, and Ahl positively refused to accept the bonds; he repeated the refusal, saying that he acted under the advice of counsel; the refusal was regarded as "final and conclusive." In August 1871, Kennedy & Stewart returned the bonds to the treasurer of the company on instructions from that officer; of this Ahl was informed, and it did "not appear that he ever made any subsequent demand upon the company for them." The master was "of opinion that the bonds were never delivered to Mr. Ahl, and that he never had any such title to or possession of them as entitled him to a claim on this fund."

The master having expressed this opinion, the counsel for Ahl proposed to give evidence, which was specified, for the purpose of showing that the persons having possession of the eighty bonds had not in equity any claim in the fund against him. The master rejected the offer.

On the 24th of December 1870, after the execution of the second mortgage, the directors of the Southern Pennsylvania Company passed a resolution reciting the contract with Richmond L. Jones for the construction of the road, to be paid for by $625,000 of first mortgage bonds; that they had subsequently paid $50,000 of those bonds to Ahl in payment for his lands, and therefore to that extent could not comply with their contract with Jones; and that Jones had agreed in lieu of those bonds to receive $75,000 of the second mortgage bonds, and directing the last mentioned bonds to be delivered to him; this was accordingly done. The company afterwards issued absolutely three of the second mortgage $1000 bonds to Henry M. Keim, and ten which became the property

of the Allegheny National Bank, leaving $112,000 of the bonds undisposed of. On the 22d of April 1871, the directors passed a resolution reciting that by reason of many of the subscribers to stock having neglected to pay their subscriptions, the company was unable to meet their obligations, and authorizing Jones to enter into negotiations for procuring individual endorsements and guaranties, &c., to provide for such obligations. On the 27th of May 1871 Jones reported to the directors, as the result of his negotiations, that he could furnish endorsements, &c., by which he could procure temporary loans, and they directed the treasurer to issue to him 1500 shares of the capital stock of the company, "in consideration of the pledging of the credit and private property of individuals for the exclusive benefit of the company;" the treasurer was directed also to deliver to Jones the remaining $112,000 of the second mortgage bonds as collateral security for the temporary loans, &c., to be procured by him; the $112,000 of bonds were delivered to him.

These bonds were delivered as collateral security for loans on the company's notes from the following lenders:—

| | |
|---|---|
| Kensington National Bank, | $34,970.50 |
| Reading Savings Bank, | 14,285.28 |
| Bushong & Brother, | 15,880.53 |

These notes were endorsed by Jones and others.

There was also due Jones for money advanced by him at various times a balance of $66,247.72. There were also individual notes under the resolution of May 27th 1871, by which the $112,000 of bonds were to be pledged as collateral, amounting to $61,438.79, leaving $4808.93 due Jones.

The master was of opinion that the $112,000 of the bonds were issued for a valuable consideration, and that Jones was entitled to their proceeds to indemnify him and those acting with him against liability for endorsing the notes held by the Kensington Bank and Reading Savings Bank, or by pledging private property for the same, and also for the balance due Jones himself; he also was of opinion, and so decided, that the whole amount of the bonds was payable to those who held them as collateral; that there was no resulting interest to the company in them, and that the other creditors had nothing to do with them. The master, therefore, after deducting the expenses of the audit, &c., distributed the fund to those holding the second mortgage bonds, and excluded Ahl's claim and the claim of Rice on his judgment.

Ahl filed a number of exceptions to the report, the seventh was to the exclusion of the evidence offered by him.

Rice also filed two exceptions, the first was that the report was premature, without affording an opportunity for a full investigation of the books, &c.

On the 3d of May 1873, the court at Nisi Prius, Mr. Justice

[Rice's Appeal.]

SHARSWOOD, directed that the stockholders of the company be allowed to appear and produce such evidence as the master may deem relevant and competent; Ahl's seventh and Rice's first exceptions were sustained and the others reserved; the case was referred back to the same master.

The master had his first hearing under this reference May 14th 1873; no new claims were presented except two by the Commonwealth for taxes; the master reported against them. He reported that an examination of the books, &c., under the order made on Mr. Rice's exception, was had, and that nothing appeared to alter his conclusions as to Rice's claim, which he had reached in his first report. He reported that the evidence introduced by the stockholders who were represented before him had no relevancy to the issues before him.

As regards the claim of Ahl there was additional evidence, viz.: On the 25th of November 1870, Maltzberger, treasurer of the company, wrote to Ahl that he had sent eighty second mortgage bonds of $1000 each, as per Ahl's directions, to Kennedy & Stewart, Chambersburg, "in compliance with the agreement of said company with yourself of June 4th 1870," to be delivered to Ahl on his application. The treasurer wrote on the same date to Kennedy & Stewart, saying he had sent the bonds, describing them, and saying they were sent in pursuance of the agreement of June 4th 1870, as in the letter to Ahl; also, a receipt for Ahl's signature speaking of the bonds in the same way. Also, a letter, August 15th 1871, from Maltzberger to Kennedy & Stewart, directing them that as Ahl had refused to accept the bonds to return them to him. Besides this, and the facts before stated of Ahl having refused to take the bonds, the master reported that before the bonds were returned to the company, Ahl endeavored to enforce his covenant with the company by holding possession of the property conveyed by him to the company, after the time fixed for his holding it "as upon a lease" had expired and, after having been dispossessed by proceedings under the Landlord and Tenant Act, commenced an action at law to recover restitution, the action being still pending; that he knew the bonds had been issued to other persons, and were still outstanding; that without making objection he allowed proceedings to foreclose the second mortgage, and at the sale gave no notice that he claimed the bonds, but gave notice that the company had no title to certain tracts of land embraced in the mortgage.

The minutes of the company showed that there were $10,000 of the second mortgage bonds issued to C. L. Magee, $3000 to H. N. Keim, $75,000 to R. L. Jones, and $112,000 were charged to collateral security account; they were disposed of as follows: July 21st 1875 to C. T. Yerkes, Jr. & Co. $15,000, August 23d 1871 to R. L. Jones $80,000, February 15th 1872, to R. L. Jones $17,000;

the minutes did not show that $80,000 or any other amount of bonds had been issued to Ahl.

By the testimony of W. H. Kemble it appeared that at a conference between himself and others, Jones being one, having reference to the purchase of the company's property, Jones said that Ahl had received $100,000 for the property sold by him to the company, and was to receive $80,000 in the second mortgage bonds, which he had refused to receive as *second* mortgage bonds so long as the preceding judgments remained unsatisfied.

The master decided that by reason of Ahl's conduct above stated and his having permitted the rights of others to intervene, he had concluded himself from any claim through the $80,000 of bonds.

The master further decided that his own duty was limited solely to distribution among the holders of the bonds under the decree of foreclosure, and that whilst he could determine the ownership of the bonds he could not " adjust the accounts of simple debt creditors." He therefore disallowed Ahl's claim.

The master further reported as to the bonds transferred for the use of the two Reading banks and Bushong & Brothers, as collateral security, that the whole amount of money for which they had been pledged had been advanced to Jones for the company from time to time on his notes. The notes having become due and the company being unable to pay, these creditors agreed to give an extension of time and forbearance for three years upon receiving the second mortgage bonds of the company as collateral, at the rate of 75 per cent. for the whole indebtedness; $97,000 of the $112,000 of the bonds received by Jones were therefore delivered to H. H. Muhlenberg as trustee for these creditors. The master held that this forbearance was of itself a good consideration; he found that these creditors had no notice of Ahl's claim on these bonds, and were holders for value without notice of any adverse claim.

As to the judgment of Boas and the Farmers' National Bank of Reading: they were entered on bonds and warrants of attorney each conditioned for the payment of the sum of $32,894.82 in two years without interest; the bonds had been executed in pursuance of a resolution of the directors and placed in the hands of of A. L. Boyer, a broker of Reading, to whom they were made payable; he disposed of them to Boas and the bank for $25,000 each; and assigned two judgment bonds to them respectively on the 8th of June 1870; the money was paid by Boas and the bank to Boyer and placed in his bank to the credit of the treasurer of the company; the treasurer paid the $50,000 to Ahl by checks on Boyer's bank before the judgments were entered. Jones had spoken to E. P. Boas and H. S. Eckert in relation to the negotiation of these bonds, but the terms were arranged by Boyer. E. P. Boas received $3000 and H. S. Eckert $5000, for their services in this

29 P. F. SMITH—12

transaction.   The master decided that the holders were entitled
to distribution on the whole amount of these judgments.

The indebtedness of the company to the Kensington Bank,
with interest to the day of sale, was $34,970.50; the $65,000 of
bonds held by them to secure this, were delivered to them at the
time the loan was made by Jones; $50,000 being his private pro-
perty and $15,000 being part of the $112,000.   The master held
that this bank was entitled to distribution on the whole amount of
the bonds held by them.

Keim, who claimed on three bonds, was secretary of the com-
pany; his salary was $2500 in arrear; the treasurer with the con-
sent of the president accepted a proposition of Keim to purchase
three bonds at 83⅓ per cent.; the treasurer gave Keim his check
for $2500 and he returned it to him in payment for the bonds.

There was no evidence to contest the claim of the Allegheny
National Bank to the ten bonds held by them; nor that of Rice
to the $25,000 of bonds held by him.

The master found that there was no fraud, and reported the
same distribution as in his first report.

Exceptions were filed on behalf of the stockholders; by Ahl
and by Rice to the master's second report.

The matters excepted to sufficiently appear in the following
opinion of the court at Nisi Prius, delivered by Mr. Justice GORDON,
December 26th 1873.

" Adopting the principle developed in the case of McElrath *v.*
The Pittsburg and Steubenville Railroad Co., 18 P. F. Smith 37,
that the master, in a case like the present, cannot go behind the
decree of foreclosure to ascertain the bona fides of the parties to
the mortgage, but is limited to a distribution of the fund raised by
the sale, we cut off many of the exceptions to the master's report,
and also much of the testimony as irrelevant.   Thus, it matters
not in the present inquiry, that Jones' contract for the construction
of the road should have been $400,000 instead of $600,000, that
the stock subscriptions were gotten on false representations, or
that Mr. Ahl was to get too much or too little for his land, or that
through misrepresentation he was induced to exchange a good
security for one that was worthless.   None of these things, nor the
intention of the directors in executing this mortgage, can now be
inquired into; the day for this has gone by.   What remains for
us to do is simply and only to distribute the fund among those to
whom of right it belongs.   As there will be no residue after the
bondholders and lien creditors are satisfied, it is clear that the
stockholders have no interests that need consideration.

" Undoubtedly the master should consider and settle the titles
of adverse claimants to the bonds; hence we may first consider
the exceptions of Daniel V. Ahl, who alleges that the master erred
in not awarding to him the proceeds of some eighty of these bonds

[Rice's Appeal.]

or rather the sum of $80,000 produced by the sale under the mortgage. If we understand the general idea contained in his exceptions, it is that the second mortgage was made chiefly for the purpose of securing to him the balance of the purchase-money resulting from his sale of lands to the company, and that therefore he had a vested right in the mortgage from the date of its execution. That the tender of the bonds was only a recognition of his pre-existing right, and that his refusal to accept them did not either extinguish or weaken that right. But we hold his position to be untenable in this, that the mortgage was executed, not to secure his purchase-money, but to secure two hundred bonds of $1000 each. How could the agreement of the company to give him eighty of these bonds create a specific lien in his favor in the mortgage itself? Suppose the bonds had never been tendered to him; that the company, in violation of their agreement, had refused to deliver them to him, could he, nevertheless, have recovered his $80,000 through a scire facias on the mortgage? We think not. It does seem to us that in such case his remedy must lie, either in covenant upon the agreement, or in a bill to rescind that agreement and restore him to his rights under his former contract. We are at a loss to discern, as alleged by his very eminent counsel, how his case is bettered by his steadfast and persistent refusal to accept of these bonds. It looks to us that this was a fatal mistake that is now past remedy. It is no doubt true that the company acted in bad faith in permitting the judgments Nos. 203 and 204, August Term of the Common Pleas of Franklin county, to precede the execution of the mortgage, but neither does this help Ahl's status with reference to that mortgage.

"It is then to us clear that the master was right in refusing to let him in upon this fund.

"We turn next to the exceptions of John Rice. He complains of the master's ruling in that he allowed the full face of the claims of Augustus F. Boas and the Farmers' National Bank of Reading (the two judgments already referred to), because these claims were in part made up of usurious interest; in other words that these judgments were purchased by the claimants at a usurious discount from one A. L. Boyer, a broker of Reading, to whom they had been executed by the company for the purpose of discount. Now whether these were bonâ fide purchases from Boyer, or were taken with the knowledge that they were confessed to him without consideration from him, and for the mere purpose of sale, matters not. Creditors cannot inquire into the good faith of the transaction, unless it covers a fraud intended to affect them. On this the authorities cited by the master are full and to the point. It is also settled that an auditor has no power to open or set aside a judgment. To him it is conclusive, and if creditors would attack it they must resort to the proper court for that purpose.

[Rice's Appeal.]

" The next exception by Mr. Rice presents the complaint that the master should only have allowed to the Reading Savings Bank Bushong & Bro., and the Kensington National Bank, the face of their claims with interest, and not the full amount of the bonds which they hold only as collateral security. No doubt this would be so were these collaterals held directly from this Iron and Railroad Company, or from Jones as their agent. But as the master has found, and we think rightly, from an examination of the testimony, that these bonds were issued to Jones for his own security, as well as that of others, in raising money for the purposes of this company, and that he will not be paid by the bonds which he received and deposited with these parties, we cannot, under such circumstances, regard the equity of subsequent creditors as superior to that of Jones, and must therefore leave these bondholders to account to their principal for any balance that may be over the amount due to themselves.

" With reference to the bonds held by the Alleghany National Bank, no such circumstances have appeared as would throw upon them the burden of proof of showing that they received them in the ordinary course of trade and for a valuable consideration. These bonds are made payable to bearer, they pass by delivery, and may be sued by the holder in his own name, so that, though not technically negotiable paper, they are practically so for all purposes of commerce. We cannot, therefore, upon the mere motion of a disappointed creditor, compel the holder of such bonds to prove that they were obtained from the company for a valuable consideration.

" Next came the three bonds held by Henry M. Keim. It is not denied that the company received full consideration for these in the way of his services as secretary. But it is alleged that the treasurer had no authority from the board of directors to issue them. We might answer this exception by directing attention to the fact that the company has found no fault with that act, and it behooves not a stranger to call it in question; nevertheless, whether the acts of the treasurer in this matter were authorized or not at or before the time it was transacted, they were acquiesced in by the directors, and thus ratified: Kelsey v. The Bank, 19 P. F. Smith 429.

" We deem it unnecessary to dwell upon the remaining exceptions, as they are substantially disposed of in what has already been said. In conclusion, we think the master has properly disposed of the fund in controversy.

" Report confirmed, and decree to be entered accordingly."

Ahl and Rice appealed from the decree at Nisi Prius to the court in banc.

Ahl assigned for error :—

[Rice's Appeal.]

1. Not decreeing to him a sum sufficient to pay him as owner of eighty second mortgage bonds.

2. Awarding to the two Reading banks and Bushong & Brother an amount sufficient to pay the eighty bonds, they not being their owners.

3. Awarding to the Kensington Bank a sum exceeding their debt.

4, 5. Awarding to A. F. Boas and Farmers' Bank of Reading each $33,908.30.

6. Awarding to John Rice a sum sufficient to pay his twenty-five bonds.

Rice assigned for error: confirming the report of the master, and directing distribution to be made as stated in the report.

*S. G. Thompson* and *A. K. McClure*, for Rice.

*W. L. McLellan* and *Black*, for Ahl.

*G. F. Baer*, for the Reading banks, Bushong & Brother, and H. M. Keim.

*G. W. Biddle*, for R. L. Jones.

*A. D. Campbell*, for the Kensington Bank.

*C. H. Jones*, for Allegheny Bank.

Chief Justice AGNEW delivered the opinion of the court, July 2d 1874.

The first subject for consideration is the fund in court. What does it represent? The mortgage under which the sale was made, embraced the entire railroad and all its land, property, franchises, sidings, workshops, stations, depots, machinery, rolling stock, and every thing of a tangible nature, then owned or to be thereafter acquired, together with all the corporate rights, privileges, franchises, easements and liberties, then existing or thereafter to be acquired. Thus not only the entire property, real and personal of the corporation, but even its capacity to make other property by its railroad and franchises, passed to the purchasers. By the terms of the Act of 8th April 1861, 1 Brightly 290 pl., 49, these purchasers became "vested with all the right, title, interest, property, possession, claim, and demand in law and equity of, in and to such railroad, with its appertenances, and with all the rights, powers, immunities, privileges and franchises of the corporation."

The fund in court, therefore, represents all that was tangible or valuable, belonging to the corporation, leaving it a denuded trunk, possessed of those powers only essential to the settlement of its

affairs: Commonwealth *v.* Central Pass. Railway Co., 2 P. F. Smith 506 ; Wellsborough & Tioga P. R. Co. *v.* Griffin, 7 Id. 417. It is to this fund, the jurisdiction of this court has attached, and hence the necessity of a full and entire distribution of the fund among all the creditors entitled to it. Jurisdiction having attached, equity comprehends within its grasp all incidental matters necessary to enable it to make a full and final distribution, and, therefore, to terminate litigation, while it affords a perfect remedy: Souder's Appeal, 7 P. F. Smith 502. Hence, in Kelly's Appeal, 4 Harris 59, in a question of distribution, involving partnership property and individual creditors, Judge Bell said: "The objection that the court or auditor had no power to state an account between the partners, is met by the answer, that the distribution of the proceeds of sheriff's sales is to be determined according to law and equity, and it cannot be questioned that in such a case a chancellor from necessity would direct an account to be taken." See also Overholt's Appeal, 2 Jones 222. The doctrine is precisely the same in regard to distribution among creditors and others, in the Orphans' Court. "The power," says Lewis, C. J., "to decide all questions necessary to a proper distribution of the fund, follows the power of distribution, and vests in the Orphans' Court as a necessary incident to the jurisdiction:" Bull's Appeal, 12 Harris 288 ; Kittera's Estate, 5 Id. 416. He states this further proposition. "The right of each (claimant) to be heard in support of his claim, and in opposition to every claimant who interferes with it, is necessarily involved in the right to demand payment out of the fund." See also Dundas' Appeal, 23 P. F. Smith 474. It was, therefore, a grave error, on part of the master, instead of distributing the entire fund among the several claimants according to their rights, to award to the counsel of the Farmers' National Bank of Reading, the Reading Savings Bank, and Bushong & Brother, the sum of $109,771.24, representing ninety-seven second mortgage bonds, and their overdue coupons, and a like error to award to the Kensington National Bank $73,536.57, representing sixty-five second mortgage bonds, and their overdue coupons. He should have awarded to the several parties named, the actual amount of their real debt, with interest to the day of sale, and the excess should have been distributed among the other creditors according to their rights. The effect of leaving this excess in the hands of these creditors, who held the bonds as mere collaterals, was to ignore both the jurisdiction and the duty of the court, to make distribution of the entire fund in its hands according to law and equity. The error of the master was, in assuming that Richmond L. Jones would be entitled to this excess which would pass into his hands from these creditors, who had received the bonds through him, as collateral for the company's debts. But the right of Mr. Jones to participate in the fund against other

creditors, and especially against Daniel V. Ahl, is one of the important questions in the distribution.

This brings us to consider the claim of Mr. Ahl to eighty thousand dollars for purchase-money, and his right to receive the same out of the fund in court which was produced by a sale under the second mortgage of $200,000. The battle before the master appears to have been fought over the question of the delivery of eighty bonds, from No. 1 to No. 80 inclusive, set apart by the railroad company for Mr. Ahl, and sent to Kennedy & Stewart, attorneys of the company, for delivery. These bonds were not delivered to Ahl, and were recalled by the company. On this ground the master thought that Mr. Ahl was not entitled to participate in the fund. But he misconceived Mr. Ahl's claim. It did not rest on a sale and delivery of so many bonds, but on his prior right to so much money as these securities represented. It is because in equity he was by the terms of his antecedent contract, the owner of so much of the mortgage which was raised under the terms of that contract to secure payment to him of the remaining $80,000 purchase-money. He was therefore entitled to a place in the distribution of the fund produced by that mortgage unless a higher equity in third parties has supervened. A short statement will exhibit the nature and the equity of his claim. He was the vendor to the company of the property from which the fund has been produced. By the terms of his first agreement of sale, December 7th 1869, his deed to the railroad company was held in escrow in the hands of a third person as a security for their compliance with the terms of sale. The company found it necessary for their purpose to have the title absolutely in themselves, and came to a new arrangement with Mr. Ahl, on the 4th of June 1870, whereby he released his title to them and they agreed to pay him $50,000 in cash, instead of the judgment of $50,000 in the first agreement, and to deliver him $50,000 in first mortgage bonds and $80,000 in second mortgage bonds, in lieu of the $130,000 of stock and of $130,000 of bonds in the first agreement.

By the terms of the agreement of the 4th of June, the company were bound, within sixty days, to execute a second mortgage, not to exceed in amount $200,000, and to deliver to Ahl eighty one thousand dollar bonds, secured by his mortgage. This mortgage was not a thing *in esse* for which the parties were bargaining, but it was to be created as the means of securing the sum of the unpaid purchase-money. The agreement of the 4th of June 1870, was, therefore, to the extent of the $80,000 of purchase-money, a deed to lead the use of the mortgage and not a mere agreement for a purchase. As soon as the mortgage was executed, Ahl's right attached to it in equity by virtue of the prior agreement to lead its use, as to so much of it. The money represented by this por-

tion of the mortgage and the bonds was his.   It never belonged to the company.   He had parted with his title on the express condition of the security of the second mortgage.   His part had been performed, and in equity his right attached immediately.   To this extent the bonds accompanying the mortgage were his, and they were actually numbered and set apart to him; vide Treasurer Maltzberger's letters to Ahl, of 28th November 1870.   As between him and the company it is clear the latter had no right to withhold them, and could not by their breach of good faith, in placing upon the property an intervening encumbrance, make his refusal to accept the bonds, until the encumbrance was removed an excuse to transfer them to others.   When they afterwards handed them over to R. L. Jones, they were guilty of a breach of trust, and he, with a full knowledge of the facts, as the evidence clearly proves, gained no title to them.   Ahl had a right to demand that the judgments should be removed before the company could be entitled to claim a full performance of their agreement.   Even a tender refused by him on this ground would not change the ownership of so much of the mortgage and bonds ; to be effectual the tender must be kept up, and if an admission of ownership—Ahl's refusal, on the ground of the actual bad faith of the company, did not change his title in equity to the security of the mortgage, as the stipulated protection for his purchase-money.

Hence the resolutions of the company of the 26th of December 1870 and 27th May 1871, under which the master finds that the bonds went into the hands of R. L. Jones, were ineffectual to transfer title to him, unless he had been a bonâ fide purchaser for value, without notice of the rights of Mr. Ahl.   But unfortunately for Mr. Jones, on the question of notice, there is not a shadow of doubt.   He was himself the party, as attorney in fact, for the company who made the agreement of the 4th of June 1870, and signed it as such attorney.   He knew precisely what the rights of Mr. Ahl were.   W. H. Kemble's testimony also brings home notice to him, and in addition we have the significant fact that the treasurer recalled the bonds from Kennedy & Stewart, by letter of the 15th of August 1871, and on the 23d of the same month they were handed over to Jones, and the further fact, that Jones was the *factotum* of the company.   These bonds are next found in the possession of the Farmers' Bank of Reading, the Reading Savings Bank, and Bushong & Brother, placed there by R. L. Jones, as collaterals for the security of overdue debts against the company, and Jones and others.   In the present state of the law, it must be conceded that railroad bonds, such as these, pass by delivery, and are protected in the hands of bonâ fide holders for value without notice, in the same manner as negotiable paper.   Whether these Reading parties are such bonâ fide holders for value, is not altogether clear.   The master thought there was a new consideration,

to wit, forebearance. The question, however, merits further inquiry. We have already adverted to the fact that these Reading creditors and the Kensington National Bank, even if bonâ fide holders, can draw from the *fund* only the real amount of their debt and interest, and not the whole amount of the bonds held as collaterals, and that the surplus must be distributed among the other creditors entitled to participate in the fund, whether Jones, or Ahl or others. Besides, some of these creditors hold other collaterals for the same debts, received from R. L. Jones, who under the facts may be compelled to suffer other creditors, claimants on the fund, to be subrogated to these securities, or, which is the same thing, that these securities shall extinguish so much of the debts for which he placed the second mortgage bonds as collaterals along with them. This is a proper subject of inquiry in making a new distribution. The principle of equitable substitution which displaces one lien creditor to make way for another, lower in the list, by reason of a superior equity in the latter, is one often acted upon. See the following cases: Erb's Appeal, 2 Penna. 296; Himes *v.* Barnitz, 8 Watts 39; Worrall's Appeal, 5 Wright 524; Barnes'. Appeal, 10 Id. 350. It is therefore a proper subject of inquiry, how far R. L. Jones, in pledging the bonds equitably belonging to Mr. Ahl, with a full knowledge of his rights, will not be postponed to him; and how far other collaterals, pledged along with these bonds, will not be required to exonerate these bonds, if found to be in the hands of bonâ fide holders for value. The argument so vehemently pressed that Mr. Ahl has received enough for his property, cannot be countenanced in a state where contracts have the protection of constitutional sanction. Courts cannot make new contracts for litigants. Under the agreement of June 4th 1870, the $80,000 of purchase-money is entitled to the same protection that is given to the first dollar paid upon the property.

The decree of the court of Nisi Prius is reversed, and it is ordered that the case be referred to another master, with leave to take further testimony, if required by the parties—the testimony on all sides to be closed by the 1st day of November next, and report to be made on or before the first Monday of January 1875. The master to report the facts and make a new distribution of the whole fund, according to the principles set forth in the foregoing opinion; and George Junkin, Esq., is hereby appointed examiner and master for the purpose.

And it is further ordered, that the master inquire into and report the facts in relation to the two judgments in the name of Amos L. Boyer, for use, aggregating $65,789.64; that is to say, whether the money advanced by the assignees of Boyer was by way of loan

or purchase; and if a loan, how much money was lent upon the same, and how much of the sum of the said judgments was usurious interest; reserving for the opinion of the court the question, whether the creditors entitled to the fund can inquire into the question of usury, for the purpose of striking from the judgment and interest so much of the same as shall be found to be usurious ?

Mr. Junkin sat on the 4th of August 1874, and subsequently. A number of stockholders were represented at the various meetings; there were laid before the master judgments against the company for land damages, viz.: Abraham Keefer, December 18th 1872, for $1500; David Teeter, April 18th 1873, for $1200; Jacob Friese, November 3d 1873, for $1712.75; also judgments, W. & A. Burgess, January 25th 1873, for $6000 on a note; James Giles, April 26th 1873, for $606.89 on an acceptance; and several other claims which were on simple contract.

Besides the facts found by the former master, it further appeared by the report of Mr. Junkin as follows :—

At a meeting of the stockholders, March 4th 1869, after the election of the first board of directors, a general resolution was passed giving the directors authority to do everything that the company were authorized to do. Jones did not become an officer because he was to have the contract for building the road, nor Ahl, because he was to sell his land to the company. The contract with Jones to build the road was made without any survey having been made; Jones did not expect to do it, but to sublet it, which he afterwards did.

On the 12th of March, John Evans, the confidential clerk and man of business of Ahl, subscribed for ten shares and was elected a director.

The president and the four directors were not expected to pay for their stock, nor did they ever pay for it; they were elected to represent Jones and Ahl, and carry out their plans. The president and two directors, who resided in Reading and held forty shares of the stock, gave their checks for $4000, the amount of their subscriptions; these checks were afterwards returned to them, and the amount charged as expenses incident to organization. About March 16th, no definite arrangement having then been made for the purchase of the land, public meetings were held at Mercersburg and elsewhere in the vicinity of the route of the road, for the purpose of inducing subscriptions. Jones spoke at these meetings, and, without asking the people to subscribe, his statements were such as to induce them to believe that he and those acting with him were able to construct the road. Subscriptions to the stock exceeding $125,000 were procured by Ahl and his asso-

ciates; on these subscriptions about $69,000 were subsequently paid. April 17th 1869, Jones contracted to build furnaces for the company; for this he was to receive 2000 shares of full paid stock, 200 of first mortgage bonds of $1000 each intended to be issued, and $50,000 in money.

On the 26th of April 1869, Ahl made a deed to Jones for one-half the land on which the company was to be organized, Jones giving him a bond for $50,000, which was to be paid as Jones should receive it from the company under his foregoing contract, and also $10,000 of the stock. Jones insisted on this conveyance as a guaranty that the enterprise would be carried on, to satisfy those who were to assist him in money matters. Afterwards the supplement changing the name of the company was passed, and Jones set the engineers to work to prepare for building the road; these and other expenses Jones paid, the company having no funds, as the subscriptions by outside parties were upon the condition that the road should be constructed to Mercersburg.

Up to the middle of August 1869, Jones and Ahl acted together in harmony; then Ahl by letter complained to Jones of the slow progress of the work, Jones's reply showed that the delay was for want of money, and that the understanding was that the $50,000 cash payment for the land was to be made from outside subscriptions for stock. On 24th August the directors resolved to call in the stock subscriptions. Up to this time there had been no absolute agreement as to the conveyance of the land; other land had been articled for and leases to Jones and Ahl procured. Under the agreement of December 7th 1869, referred to in the first master's report, the company was not to issue in the aggregate more than $855,000 in bonds, and none of them were to have a claim or lien paramount to the 130 bonds to be issued to Ahl; at the same time Jones gave to Ahl a written agreement that the company should not enter the deed of December 7th 1869 held by Evans in escrow, for record until after two weeks' notice to Ahl, and six tracts of the land were to be reconveyed to Ahl; the deed to Jones of April 26th 1869 for half the land was handed back to Jones, the furnace contract abandoned, and the bond of Jones for $50,000 was cancelled. On December 14th 1869 the company executed an ordinary judgment-bond to Ahl for $130,000, payable with seven per cent. interest on the 14th of December 1877, and reconveyed to Ahl the six tracts; this left in the company about 3690 acres. On the 24th of December 1869 the directors instructed the treasurer to pay R. L. Jones $10,000, "in repayment of money advanced by him from time to time to the company, and for his expenses incurred in the company's service."

On the 20th of January 1870 Ahl's deed was delivered absolutely to the company, and the $130,000 bond, the stock, and the deed for the six tracts, delivered to Ahl. He entered judgment

on the bond in Franklin county on the 22d of January 1870, and recorded the agreement of December 7th 1869; it was intended to be recorded; Ahl's deed to the company was recorded April 19th 1870. May 1st 1870, the time when Ahl's $50,000 judgment-bond would be due, he applied to Jones for payment; Jones declined to pay unless Ahl would cancel the agreement of December 7th 1869, telling him that the agreement did not express their original understanding, but that Ahl had taken advantage of the circumstances in which Jones had been placed to enforce its execution. The recording of the agreement had brought it to the notice of Mr. Watts, president of the Cumberland Valley Railroad Company, who had been advancing money to the Southern Pennsylvania Company under their agreement; he refused to advance any more money unless the agreement of December 7th 1869 was cancelled. This brought about the agreement of June 4th 1870, heretofore referred to, by which, amongst other things, Ahl was to receive $80,000 in second mortgage bonds. In order to pay Ahl's judgment, the company had authorized the president to borrow $75,000 on the company's note, with judgment-bond and pledge of the corporation bonds as security. To raise this money Jones commenced a negotiation with the Farmers' National Bank of Reading, of which H. H. Muhlenberg was cashier, and the Reading Savings Bank, of which E. P. Boas was cashier, and his father, A. F. Boas, president; E. P. Boas was also a director of the Southern Pennsylvania Company. To cover the usury to be paid, the company executed to Boyer the judgment-bond mentioned in the first master's report, and two notes, dated June 1st 1870, to the order of McCarty, their president, for the same amounts; these notes were endorsed by McCarty and Jones; one of the notes was discounted by each of the banks, and the proceeds, $28,957.54 in the Savings Bank and $28,947.41 in the Farmers' Bank, credited to Boyer; the discount was taken from these sums, and but $25,000 on each note paid to Boyer, who was to be paid for his services one-fourth of one per cent. The master found that the company owed him nothing; that the transaction was a loan to the company by the banks of $25,000 each for two years. Jones went to Chambersburg, and on June 4th 1870 paid Ahl by the treasurer's checks $38,956, which was credited on his judgment, delivered to him the $50,000 first mortgage bonds, and the agreement for changing their arrangements was concluded; the judgments assigned to Boas and the bank were entered in Franklin county June 9th 1870. The balance, $11,544 of Ahl's judgment, was paid July 16th 1870. Jones's action in these matters was approved by the directors at a meeting June 25th. Ahl wrote to the secretary for the $80,000 of bonds on the 2d of September 1870, and again on the 25th of October 1870. He knew of the entry of the judgments in the last week of October 1870, but there was

[Rice's Appeal.]

nothing to show that he knew it before. The circumstances of the offers and refusal of the bond are substantially stated in the first master's report, with this in addition, that about that time, he asked Kennedy & Stewart, the solicitors of the company, to use their influence with the company to have the judgments removed; they informed him that Mr. Jones said it could not be done. Ahl continued in possession of the furnace, carrying it on under his contract of June 4th 1870.

About February 19th 1870, the St. Charles Iron Company was incorporated; there were seven corporators; stock to the amount of $100,000 was subscribed, but none was ever paid for. Most of the corporators were in some way connected with the Southern Pennsylvania Company. R. L. Jones was the president. George Rice, one of the directors, was one of the sub-contractors of Jones for the building of the Southern Pennsylvania road. The "improvements" contemplated by the company were building a railroad from the road of the Southern Pennsylvania Company through their land to their ore-banks, and the various apparatus to prepare the ore for market. George Rice was to make these improvements for $75,000. He was to pay for them, the other stockholders to be credited on their stock for this amount, Rice to get $25,000 of stock for nothing; and to be reimbursed for his outlay by being permitted to mine a certain quantity of ore. No money was ever paid into the treasury; no contract was made by Rice with the St. Charles Company, but the arrangement was by an "understanding" between him and the officers of the Southern Pennsylvania Company. On the 19th of November 1870, the two companies made a contract by which the St. Charles Company was to mine and prepare for the market, iron-ore not exceeding 20,000 tons per month, and deliver it on the Southern Pennsylvania Company's road, for which that company were to pay them $1.50 per ton; the St. Charles to have the right also to mine for their own furnaces at fifty cents per ton. Rice commenced the improvements in the winter of 1871–1872. On the 5th of January 1871, Jones sold twenty-five of his seventy-five second mortgage bonds to George Rice, and on the 14th of March 1871, the remaining fifty bonds were issued to Jones.

At a meeting of the directors of the Southern Pennsylvania Company, January 28th 1871, one item of the treasurer's report was :—

"$1000 second mortgage bonds for D. V. Ahl, now in the hands of Kennedy & Stewart, $80,000."

The treasurer's report was accepted and approved.

When McCarty and Jones, on the 1st of April 1871, went to take possession of the furnace property, Ahl refused to surrender it, saying that he had not been paid for the property and he intended to hold it. Jones replied that he had been paid, the bonds

were in the hands of Kennedy & Stewart, and he could get them at any time.   The president brought the workmen from the railroad and took possession by force of the furnace and its appertenances.   Ahl remained in possession of the mansion house and all the other buildings.   He was afterwards dispossessed by proceedings under the landlord and tenant acts, the writ of possession having been executed May 9th 1871.

A certiorari to the justice's proceedings was issued.   One of the exceptions to the proceedings, was that the relation of landlord and tenant did not exist.   The certiorari was still undisposed of. McCarty and Jones were afterwards convicted in the Quarter Sessions of forcible entry.

The work on the railroad continued to progress; the bonds and stock were issued by Jones on his contract; passed away by him to others; the coupons became due; engineering expenses were to be met, and money to be raised for these matters.   "Jones was in fact the company; the directors from the first had been put there by him and Ahl, and all the details of the business and the acts of the company had been prepared by him, and ratified by the directors as and when he requested it."

When Jones was seeking for money to pay the matters just mentioned, he applied to the Farmers' Bank of Reading, which was one of the state treasurer's depositories.   The officers of the bank said they were not in funds to accommodate him, but would if they had funds.   Jones then requested the state treasurer to deposit funds there; he did so.   It was afterwards agreed with the treasurer that he, the treasurer, should have some of the corporation bonds; by his direction 100,000 of the second mortgage bonds were• issued to C. L. Magee for him, "as commission on sundry temporary loans."   These bonds are those claimed by the Allegheny Bank.

On the 27th of May 1871, the president was authorized to execute an instrument "for securing the payment to C. T. Yerkes Jr., of a certain sum of money, being the amount of certain bonds which said company have agreed to purchase from said Yerkes on July 22d 1871, and also a warrant of attorney for confession of judgment in his favor in case of non-payment by the company."   This was but a mode of covering usury for the loan of money.   The loan had been made by Yerkes to Jones on notes, with company second mortgage bonds as collateral.   Yerkes afterwards borrowed money from the Kensington Bank and gave the notes and bonds as part of the collateral security for the loan.   Yerkes could not state the rate of discount which he charged Jones, but it "was more likely over than under one per cent a month."

Jones, on March 11th 1871, obtained on his note for $30,000 to his own order a discount from the People's Bank of Philadelphia. The proceeds were used by him for the company.   As this note approached maturity, June 12th 1871, the bank discounted the

company's note for $40,000, endorsed by McCarty, R. L. Jones and J. Glancy Jones, his father; $30,000 of the proceeds were applied to payment of the first note. Jones drew the balance and used it for the company. Both notes were discounted at one per cent. per month. The mortgage bonds remained in the bank as collateral for this note, which, on October 14th, was protested for non-payment. To meet this note, Jones raised money as follows:—

Isaac Althouse discounted the company's note, dated October 16th 1871, for $15,120, payable in four months, to the order of Jones, endorsed by him, McCarty and J. G. Jones, and guarantied by Bushong & Brother. Bushong & Brother took up this note on their guaranty, and continued to hold it. Jones had his own note for $15,000, dated October 5th 1871, with McCarty's endorsement, discounted at the Farmers' Bank of Reading. A company's note, dated October 17th 1871, endorsed by him, for $5000, and a similar one for $2667.07, were discounted by the Reading Savings Bank. Jones's own note for $5333.33, dated October 31st 1871, was discounted by Bushong & Brother; it was secured by his judgment bond for the same amount to Baer, their counsel, who at once assigned it to them. The proceeds of these notes were $40,002.40, and were applied to take up the note in the People's Bank. Jones had his own note of September 17th 1871, for $15,000, discounted by the Farmers' Bank of Reading, and applied the proceeds to use of the company. To secure these parties McCarty and Jones executed two judgment bonds to H. H. Muhlenburg, as trustee for them; one was for $35,197.77 and the other for $52,850; judgments were not entered on these bonds.

In relation to the return of the $80,000 of second mortgage bonds, and the bonds held by Keim, Mr. Junkin found substantially as the first master.

Jones borrowed from Yerkes, as before stated, on two notes drawn by McCarty and J. Glancy Jones, endorsed by him, and amounting together to $33,881.53; as collateral security he deposited sixty-five of the company's second mortgage bonds. Yerkes passed these notes and bonds to the Kensington Bank as security for a loan made by that bank to him. In thus receiving the bonds the bank had "no knowledge of any kind affecting the integrity of these bonds." When the notes matured, October 26th and 27th 1871, they were renewed by the bank taking the company's notes for $25,000 and $8000; these notes were renewed by notes falling due about January 1st 1872, the same collaterals remaining with the bank; $881.53, the difference between these notes and the original notes, and also the discounts on renewals, were paid by Jones. All the money received by him from Yerkes was used in payment of the company's debts.

To meet maturing coupons of the company, Jones procured Bushong & Brother to discount his note for $22,600; the coupons

came to $250 more than the proceeds of the note; for this Jones gave them his note, which they still held. The Reading Savings Bank, July 21st 1871, discounted for Jones the company's note for $5806.91; the proceeds were used in paying the company's debts.

On the 24th of February 1872, the directors authorized the treasurer to advance money to the St. Charles Company as the president might direct.

About January 22d 1872, the notes of September and October 1871 not having been paid, negotiations were had between the Reading banks, Bushong & Brother, the Kensington Bank, their respective counsel, and the endorsers of the notes. The makers and endorsers wanted time. Jones then had the eighty bonds which had been set aside for Ahl, and seventeen of the two hundred which remained undisposed of; these he proposed to hand over to the banks. Mr. Baer, who was of counsel with the Reading banks and the Bushongs, asked him for his authority to dispose of them; he then produced certified copies of the resolutions of April 22d and May 27th 1871, authorizing him to use the bonds for raising money for the use of the company. Neither Mr. Baer nor any of those whom he represented had any knowledge of the transactions with Ahl in relation to the eighty bonds. All the parties but the Kensington Bank then entered into an agreement by which McCarty, J. G. Jones and R. L. Jones, parties of second part, were to confess a judgment to H. H. Muhlenberg in trust for these creditors pro ratâ; the creditors to hold the collaterals they already had; the second mortgage bonds to be given to the trustee at seventy-five per cent. as collateral to secure the indebtedness and to deliver to any creditor who might desire bonds at seventy-five per cent. in payment of his debt; to pay to trustee twenty-five cents per ton for one-half the iron-ore mined on the company's lands; the creditors to have the right to sell the bonds in payment of the claims, but not for less than seventy-five per cent. during the first year; no execution nor final process of any kind to be issued for three years, unless upon a statement, which the trustee had the right to demand at the end of the year, it should be found that the security had been impaired, when on thirty days' notice he could cancel the agreement and sell the collaterals; during the three years none of the real estate and other property of the parties of the second part should be disposed of by the company, or converted except for expenses or in discharge of liens, and then the surplus to go to the trustee, and any violation of the preceding clause to work a forfeiture of the agreement, and the creditors might proceed at once to sell the securities and collect the money due. To the agreement was appended a statement of the property of the several parties. The Kensington Bank thought best not to join in the foregoing agreement, but the president assured the

other parties that the bank would not interfere to defeat it; the parties to the agreement, therefore, further agreed that if the bank or other holders of the collaterals should take steps to collect their claims so as to defeat the object of the agreement, the party of the first part might cancel it and take such steps as they chose. The ninety-seven bonds were, February 17th 1872, delivered to the trustee under the agreement, but the judgment-bonds were not given. The company failed to pay the coupons of March 1872 on the bonds of both mortgages, and the holders threatened to foreclose the first mortgage.

The account of Jones in the ledger of the Southern Pennsylvania Company, showed a balance in his favor of $66,247.72. His credits included the amounts claimed by the Reading banks and Bushong Brothers. Amongst the credits were these items also:

" 1871, March 2d. For money advanced and expenses incurred by him to December 24th 1869, as per resolution of the directors of that date for $10,000. Of this amount $2781.56 cash advanced to the company to said date, December 24th 1869, has already been passed to his credit, leaving a balance due him for this transaction        .        .        .        .        .        .        .        .        . $7218.44

" July 22d. By bills payable for paying company's note to H. J. Eckert, paid this day        .        .        .        .        .        .        $5000

" 1872, April 24th. By contingent expenses for order received from R. L. Jones on treasurer of company, signed E. P. Boas, and dated April 24th 1871, being the full amount due Boas for commissions        .        .        .        .        .        .        .        .        . $3000"

George Rice was unable to complete the road of the St. Charles Company; he had expended about $32,000, and contracted debts; his father, John Rice, had lent him money, but was in no way connected with the contract. In consequence negotiations were commenced between John Rice and the companies; they resulted in an agreement, made April 23d 1872, between him and the St. Charles Company, by which he agreed to assume the contract of George Rice, to save the parties from all liabilities to George, &c., John Rice to have the right to mine 200,000 tons of iron-ore, using the machinery, &c. There was also a modification made in the contract between the two companies, and the contract of John Rice was approved; the directors of the Southern Pennsylvania Company also assented to John Rice mining " 225,000 tons of iron-ore without payment of royalty in consideration of the obligations and covenants assumed" by him.

On the 25th of May 1872, the directors of the Southern Pennsylvania Company authorized Jones " to sell the one hundred and twelve bonds at public or private sale and apply the proceeds to the payment of the loans made or procured to be made."

On the 8th of June the contract with Rice was further modified so that he was to afford facilities to enable the St. Charles Com-

29 P. F. Smith—13

pany to deliver 7000 (instead of 20,000) tons a month to the Southern Pennsylvania Company. John Rice commenced and was progressing with the work under George's contract when proceedings on the mortgage were commenced.

During the summer of 1872 various unsuccessful efforts were made to extricate the Southern Pennsylvania Company from its embarrassments. Ahl then learned, if he had not before, "that the eighty bonds were in the hands of other parties as collaterals. He expressed regret that he had not taken the bonds, and said he had been badly advised. He does not seem at any time after he had refused to accept them, to have claimed them as his. * * * It became evident that the company's road and franchises would be sold under one or other of the mortgages."

On the 13th of August 1872, all the contracts between the two companies, and between them and John Rice, were cancelled; and it was agreed that a judgment should be confessed by the Southern Pennsylvania Company in favor of John Rice for $125,000, payable in sixty days in full of all his claims, including his right to mine 225,000 tons of ore; his expenditures were not then ascertained; the railroad he was to construct was completed that fall; his actual expenditures, including those of George, were $103,711.79, to which Rice added a commission of fifteen per cent., making his whole bill $118,789.51, with interest. The $125,000 judgment was entered in the Court of Common Pleas of Franklin county August 19th 1872. The purpose of this arrangement was to give Rice a lien on the Southern Pennsylvania Company's property before a sale should be had under the mortgage. John Rice had also become the owner of the twenty-five second mortgage bonds sold by Jones to George Rice.

At the sale of the road there were but two bids: one on behalf of the Reading banks for $300,000, and the other for $305,000 by John Rice.

The master disallowed the claims of the Commonwealth, those for land damages, and that of the Allegheny National Bank, for reasons stated in his report.

With regard to the claims of the Reading banks, he held that the judgments given to Boyer and assigned to them were mere covers of usurious interest, and that they were entitled to receive no more than the amounts actually lent, viz.: $25,000 each, with interest. He allowed the claim of John Rice on the twenty-five second mortgage bonds. He allowed the claim of the Kensington bank on two notes of $25,000 and $8000, respectively, with interest. He held that the bank held the sixty-five second mortgage bonds bonâ fide for value, and were entitled to be paid the amount of their claim from their proceeds.

As to the claims of the Farmers' Bank of Reading, the Reading Savings Bank and Bushong & Brother, the master held that they received the bonds bonâ fide, without notice of any claim which

Ahl had upon them; and in consideration of forbearance and giving time, under the agreement of January 22d 1872, consummated by the delivery of the bonds, February 17th, which was a sufficient consideration, although given as collateral for an antecedent. He found also that the agreement did not include the Bushong judgment for $5333.33 and Jones's note to them for $250, nor Jones's note to the Savings Bank for $5806.91. He held, however, that as the resolutions of the directors gave the bonds to Jones to use as collateral for money to be raised by him for the company, and as the money represented by these three claims was for the use of the company, the collaterals to the extent for which they would be liable to Jones should be applied to those debts as if the money had been due to him. He held, however, " for reasons to be stated," that Jones could not claim the bonds, and therefore he excluded these claims from distribution; he allowed the other claims of these parties.

The master found that Rice's judgment was a valid debt.

As to Jones's individual claim, as appeared by the books, the master reported: "A bookkeeper was employed and kept the books; Mr. Jones had no hand in them except a general oversight. The books appear in the main to have been fairly kept. They were thoroughly and exhaustively examined by a professional accountant of no mean skill, and no serious defect has been shown. * * * The master is unable to see anything in his management of the details of the company's business to show that Mr. Jones intended to do wrong or defraud any one. He did things which a strict and proper morality condemns. * * * His account on the books of the company developed a few matters which were the subject of objection, and must be passed upon. It includes, of course, many of the loans procured by him from the various parties whose claims have been heretofore considered. These being paid, are, of course, to be stricken from his account, should it become necessary to state the account accurately. In addition to these there are other items. The directors, at a meeting heretofore mentioned, voted to him $10,000 for expenses paid by him in the organization of the company. For a portion of these, items were stated subsequently, and the same were entered upon the books in detail. After this, there is a mere lumping credit given in one sum of $7218.44. No items were given in the books, nor was he able to give the items when examined; merely saying that he had expended moneys to a large amount, and setting forth, in a general way, their character. This, the master thinks, is inexcusable. It was his duty to have kept an account and the vouchers. He has neither. This item must be stricken out."

Referring to the payment of $5000 to H. S. Eckert for his services, the master said:—

"In the opinion of the master, the payment was wrong, and ought not to have been made or received, and must be disallowed.

A similar payment of $3000 was made to Mr. E. P. Boas for similar services. Mr. Boas was a director of the company, and cashier of the Savings Bank, of which his father was president. This was manifestly wrong in both the payer and the receiver, and the payment must be disallowed. * * * The books examined by the accountant show a balance due Mr. Jones of $66,247.72. If from this are stricken out the amounts which will be awarded out of this fund to the banks and Bushong & Brother, and also these items just referred to, Mr. Jones will be in debt to the company."

As to the claim of D. V. Ahl and R. L. Jones: "In the view the master takes of these claims, they must be considered together. The case as now presented as to both of these gentlemen, is very different from that before the former master and the court. Then it was simply that of a person selling lands to a corporation, and its agent bargaining with him, each endeavoring to make the best bargain. Now we have the whole history of the transaction from beginning to end, and it exhibits facts which may almost be said to be agreed upon; certainly they are to a very large extent indisputable.

"Mr. Ahl and his brother owned these 5400 acres of lands, to which they desired a railroad to be built, in order to enhance their value and develop the same. They also owned others in the vicinity. * * * From all the evidence submitted, $100,000 is probably their full cost. In his first negotiation with Mr. Jones and others, D. V. Ahl put the price of all the 5400 acres of land at that sum. Mr. Ahl really was the Caledonia Company. * * * He and Mr. Jones then agreed to breathe life into this charter, and to use the corporation to make individual profit out of Mr. Ahl's lands, and a railroad to be built to it. The one was to put in the lands and the charter, and the other was to raise the money to build the road. Mr. Ahl was to get control of all the stock, or a sufficient part to govern the corporation; he was never to pay for any of the stock, and he was to sell his lands to the company at a price which he and Mr. Jones should agree upon, and Mr. Jones was to have the contract for the road at a price Mr. Jones and he should agree upon. This scheme was carried out. * * * He and Mr. Jones did not become directors, because the one was to sell the lands to the company, and the other was to have the railroad contract. Immediately, without any surveys, or estimates, or examination by any director to see if it was a wise and prudent contract for the company, before the *termini* of the road were known or fixed, the contract was made by the directors with Mr. Jones, that he should build the road for $625,000 in bonds and $625,000 in stock, full paid. As yet the company had no money or lands. Mr. Ahl agreed to this contract. From these terms Mr. Jones did not subsequently at any time vary.

"They then set to work to get outside subscriptions to this stock by bonâ fide subscribers. In order to induce parties to subscribe,

[Rice's Appeal.]

Mr. D. V. Ahl put down in the subscription book his name and his brother's for one hundred shares, although it had been distinctly agreed between him and Mr. Jones that he should not pay for it; and so likewise, that he should not pay for any of the other stock transferred to him. He says that he did all this for Mr. Jones. Even if this were so, it does not lessen the deception practiced upon the genuine subscribers. * * * Neither of them revealed the fact that the railroad contract had already been signed, and that Mr. Ahl was to sell his lands to the company. * * * But when the enterprise looked as if it would succeed, Mr. Ahl insisted upon different and better terms for the land. And it is very evident that Mr. Jones agreed to the terms of the contract of December 7th 1869 very reluctantly. But were he alone to be considered, this would be wholly immaterial. Parties must abide by their written contracts. On December 7th 1869, however, other parties had rights; and the future creditors and stockholders had rights which required to be respected and protected. On that day Mr. Ahl himself virtually was the company—the directors were his directors—Mr. Jones was their *agent ;* and it really was nothing more than a contract between these two ; and it was in furtherance of their individual scheme, and for their individual profit. Neither of them was endeavoring to take care of the interests of the future stockholders and creditors. Mr. Ahl by that contract secured for himself much more than he originally asked for his lands, or than they were worth. * * * It is no answer to say that Mr. Ahl was dealing with Mr. Jones and his associates. He was not. He was dealing with himself, then the only stockholder of the company ; or if not that, with a corporation whose directors he had elected for the very purpose of carrying out a secret scheme to enrich himself and Mr. Jones. Was this a compliance, in letter or spirit, with that section of the charter which allowed payment for stock ' at a bonâ fide valuation, to be agreed upon by a majority of the subscribers and stockholders ?' * * *

" All this, and much more, demonstrates that it was a *joint* speculation, and that the corporation was a mere means they used to accomplish their private ends. Their true relations to the enterprise and the company they studiously kept to themselves, and absolutely concealed from the outside public whom they were endeavoring to, and did, induce to invest their money in the company. The main features of the enterprise were agreed upon by both. The details were managed by Mr. Jones through the directors. And it may be said generally, that *they* were merely his instruments in carrying forward the whole subsequent movements of the company. All of its action was prepared and moulded by him. When the agreements of June 4th 1870, came to be made, he settled the terms of that contract with Mr. Ahl. Had Mr. Ahl been dealing with Mr. Jones alone, or with the company, as

mere independent vendor and vendee of lands, the principles laid
down by the court in its opinion would compel the master to hold
that Mr. Ahl must be paid the $80,000 bonds, unless they were
in the hands of innocent holders.  For the contract was, that he
should have $80,000 in second mortgage bonds, which meant that
there was to be no intervening encumbrance ; and the confessing
of the two judgments, and then tendering to him the second mort-
gage bonds, was not a compliance with the contract.  * * *  But
still, at this very time, Mr. Ahl was dealing with Mr. Jones, the
*agent* for the very directors whom he (Ahl) had put into office for
the very purpose of doing Mr. Jones's bidding.  * * *  In the
opinion of the master, this transaction, as against the genuine
stockholders and subscribers to the stock and the creditors, stands
in no better condition than the agreement of December 7th
1869.  * * *

"The question to be decided is, who in equity and good conscience
ought to take this money ?  * * *  Promoters, directors or agents
of a company shall not make a profit out of it in buying lands for
it, or in dealing with it.  * * *  So far as Messrs. Ahl and Jones
are concerned as against the genuine stockholders and creditors
of the company, their dealings have been in fraud of them.  What
Mr. Jones's actual profit on his railroad contract was does not
appear."

The master then enumerated certain items of his profit, and
proceeded :—

"He also got and has $625.000 in stock.  Mr. Ahl has already
received $50,000 in cash and $50,000 in good gold bonds, and
$120,000 in company stock.  * * *  Both of them were bound to
put into the treasury of this company, for their stock respectively,
the sums of $120,000 and $625,000 in money or *its value*.
Neither of them has done this.  Had they each been dealing with
a real corporation, or real directors of such a company, ' at arm's
length ;' or had they informed the other subscribers of their actual
plans, instead of studiously and carefully concealing all these in-
side agreements and plans from them, their position would have
been as clear and impregnable as that of any other man who acted
in good faith.  * * *

"In the opinion of the master, neither of these parties, in good
conscience and equity, is entitled to any of the fund in court
as against the creditors and other stockholders of the com-
pany.  * * *

"The fund is to be distributed to the liens in their order.
The judgments to the Reading banks are first; then the lien of
the second mortgage.  The only parties holding bonds who are
entitled to be paid are Mr. Keim, Mr. Rice, the Reading banks
and Bushong & Bro., to the extent heretofore allowed.  And after
the bondholders comes Mr. Rice's judgment, which is only partially
paid by the balance."

[Rice's Appeal.]

The master reported distribution as follows :—

Balance, including interest on the fund, since January 27th 1873, after deducting the master's fees and other expenses . . . . . . . $318,147.10

To Farmers' Bank of Read-
ing, assignee of judgment
in favor of A. L. Boyer, $25,000.00
Interest and costs . . 3,834.95   $28,834.95
Same—Notes of September
1st and October 5th 1871,
$15,000 each . . . 30,000.00
Interest . . . . 1,366.23   $31,366.23
                                          $60,201.18

To Reading Savings Bank—
assignee of judgment in
favor of A. L. Boyer, . 25,000.00
Interest and costs, . . 3,834.95
                        $28,834.95
Same—Note, Oct. 20th 1871 2,669.07
Same—Note, Nov. 23d 1871 5,000.00
Interest on both notes . . 461.78   8,130.85
                                          36,965.80

To H. M. Keim—three second
mortgage bonds . . 3,000.00
Coupons and interest . . 188.13
Premium on gold . . 366.63
                                          3,554.76

To Bushong & Brother—Note,
August 1st 1871 . . 22,600.00
Same—Note, Oct. 16th 1871 15,120.00
Interest on both notes . . 2,304.23
                                          40,024.23

To Kensington Bank—Note,
October 6th 1871 . . 25,000.00
Same—Note, Nov. 29th 1871 8,000.00
Interest on both notes . . 1,930.38
                                          34,930.38

To John Rice—twenty-five
second mortgage bonds . 25,000.00
Coupons and interest . . 2,347.87
Premium on gold . . . 3,144.98
                        30,492.85
Same on account of judgment   111,977.90   147,470.75

                                          $318,147.10

All the claimants except Rice filed exceptions with the master. to his report.

.The master reported on the exceptions that they presented no grounds upon which he should change his report.

The exceptions were argued in the Supreme Court, March 18th 1875, before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

*W. S. Stenger* and *Black* (with whom were *D. W. Sellers* and *W. McLellan*), for Ahl.

*W. Mac Veagh* and *G. W. Biddle* (with whom was *C. H. Jones*), for R. L. Jones.

*A. D. Campbell,* for Kensington Bank.

*G. F. Baer,* for the Reading banks, Bushong & Brother and H. M. Keim.

*F. C. Brewster* and *A. K. McClure* (with whom was *S. G. Thompson*), for Rice.

*W. S. Stenger* and *J. Stewart,* were for Keefer, Teeter and Fries.

The other exceptants were not represented.

Mr. Justice PAXSON delivered the opinion of the court, November 24th 1875.

This case differs essentially from the one presented by the former master's report. We have now a full history of the organization of the company and of its affairs down to the sale by the trustee of its property and franchises. A large amount of additional testimony has been taken, from which the master has found the facts clearly, and in the main accurately. The former rulings of the court were made upon the case as presented at the time. In the examination and decision of the case now we have the benefit of the additional light thrown upon it by the report of the present master.

The fund is insufficient to pay the liens as they stood against the property on the day of the sale. Hence it is clear that no creditor, whose claim is unprotected by a lien, can share in the distribution. It is therefore useless to make further reference to claims of this class. The lien claims as found and allowed by the master are as follows:—

1. Judgment of the Farmers' National Bank of Read-
   ing for      .      .      .      .      .      .      .      .      $25,000
2. Judgment of the Reading Savings Bank for   .    .      25,000
3. The second mortgage under which the property
   was sold    .      .      .      .      .      .      .      .      200,000
4. Judgment of John Rice, for      .      .      .      .      125,000

The liens are stated in the order of their priority.   As the net
fund for distribution, exclusive of interest, is $305,000, it is
manifestly insufficient to pay them all in full.   The judgments of
the Reading banks, being first in point of time, are entitled to pay-
ment to the extent they have been allowed by the master.   The
reduction of these judgments to the amount actually loaned by the
banks, was right, and needs no discussion.   Next comes the mort-
gage of $200,000.   This also must be fully paid to the extent that
the bonds are in the hands of bonâ fide holders for value.   After
which, if there be any surplus, it must be applied to the subse-
quent judgment.

The principal contention is over the second mortgage bonds.   It
is important to understand where they are, and by whom, and for
what purpose held.   The entire number, two hundred, of one
thousand dollars each, were issued by the company, and are now
held as follows: sixty-five thereof are held by the Kensington
Bank as collateral security for two loans, aggregating $33,000,
made to the company; fifty of these bonds so pledged to the Ken-
sington Bank, belong to Richmond L. Jones, and were a portion
of a batch of seventy-five of said second mortgage bonds, issued
to him by the company in lieu of $50,000 of the first mortgage
bonds of said company, which he was entitled to receive upon
account of his contract for the construction of the road.   Mr.
Jones agreed to receive these second mortgage bonds, and they
were formally delivered to him in satisfaction of his claim to the
first mortgage bonds.   His title to them is therefore complete.
Subsequently, as the master finds, he pledged fifty of these bonds
($50,000), with fifteen of the second mortgage bonds ($15,000),
belonging to the company with Charles T. Yerkes, Jr., in order to
raise money for the company; Yerkes obtained the money from
the Kensington Bank and deposited the said sixty-five bonds as
collateral.   The bonds so pledged are liable to the bank for the
amount of money loaned thereon.   After the debt due the bank is
paid, Mr. Jones is entitled to so many of the said bonds as may
remain, and to come in upon the fund to that extent, unless pre-
vented by a higher equity in some one else.

The Allegheny National Bank (C. L. Magee) is, or was the
the holder of ten ($10,000) of these bonds.   The master finds
that said bank is not a holder for value, and for satisfactory rea-
sons reports against this claim.

H. M. Keim, of Reading, is the holder of three ($3000) of the bonds. His claim was properly allowed by the master. So, also, the claim of John Rice as to twenty-five ($25,000) of said bonds. There are ninety-seven ($97,000) of the bonds remaining. They are held by H. H. Muhlenberg, in trust for the Reading banks before mentioned, and for Messrs. Bushong & Brother, bankers, as collateral for certain loans and advances made to the company. Said loans include the two judgments of $25,000 each, to which reference has already been made. These transactions were arranged by Richmond L. Jones, by authority of the company. In order to enable him to raise money for the corporation, as well as to secure him upon his own endorsements, and those of his friends, all that remained of the second mortgage bonds, amounting to one hundred and twelve ($112,000), were placed in the hands of Mr. Jones. Among the bonds thus handed over to him and pledged for the benefit of the company, and which are now held for account of the Reading banks and Messrs. Bushong & Brother, are eighty of these second mortgage bonds ($80,000), Nos. 1 to 80 inclusive. These bonds were originally issued to Daniel V. Ahl, by the company, and intended as part payment for the ore-lands sold by Mr. Ahl to the said company. By his contract with the latter, Ahl was entitled to $80,000 of second mortgage bonds. When they were tendered him he refused to receive them, for the reason that the judgments of the Reading banks had been entered up before the second mortgage was executed and recorded. The effect of this was to make the mortgage a third instead of a second lien. These eighty bonds were sent to Messrs. Kennedy & Stewart, attorneys-at-law, Chambersburg, Pa., for the purpose of delivery to Mr. Ahl, who refused to receive them as before stated. Upon this point the master finds the following facts : " Shortly after November 28th 1870, Mr. Ahl called on Messrs. Kennedy & Stewart, and he was told by them that they had the bonds to deliver to him, and would get them from the bank for him. He declined to accept the bonds, said they need not go and get them, and gave as his reason that the bonds were not, as he said, second mortgage bonds, such as he was entitled to receive under the agreement. This objection and refusal were made to Messrs. Kennedy & Stewart repeatedly between that time and August 1871. He was accompanied by his counsel, and he asked Messrs. Kennedy & Stewart to use their influence to get the officers of the company to remove the judgments ; and he was informed by them that Mr. Jones said it could not be done. Messrs. Kennedy & Stewart regarded his refusal as final and conclusive." Subsequently, as the master finds, when the company became further embarrassed, and Mr. Ahl learned that they were in the hands of other parties as collateral, he expressed regret that he had not taken them, and said that he had been badly advised. Yet even then, he did not

[Rice's Appeal.]

allege that they belonged to him. Now, he claims these eighty bonds, and says that after setting them apart for him, the company had no right to authorize Jones to pledge them for its debts. That his refusal to accept them did not in equity change the property in the bonds, and that it was open for him to accept them at any time. This claim amounts to nothing as regards the Reading banks and Bushong & Brother. They are holders for value, and the bonds passed by delivery. Nor is it valid against other lien-creditors of the company. Mr. Ahl has no legal claim upon the bonds or the fund before us. This is a question of lien. Mr. Ahl has no lien. The mortgage was a lien, but it was for the protection of the bonds issued under it, and which it was intended to secure. Aside from the ownership of the bonds, or a portion of them, Mr. Ahl has no interest, legal or equitable, in the mortgage. It was not created for his benefit, but for the purpose of enabling the company to raise funds to meet its obligations. Among those liabilities was the $80,000 due Mr. Ahl. He was offered the security of the mortgage and declined it. He deliberately rejected the bonds when tendered. He rejected them under the advice of counsel. He certainly had a purpose in view in doing this. The bonds offered were not such a security as under his agreement he was entitled to receive. But they were the best the company could give him, and he was fully aware of this. He knew they could not raise the money to satisfy the judgments. He had already received the money realized upon the latter. He could only have had in view, therefore, the obtaining of better terms from this already embarrassed company. At that time he was still in possession of the furnace. He saw they could not comply with the letter of the contract by giving him bonds which should be a second lien. He had a right of present action against the corporation, either for breach of covenant, or for the unpaid purchase-money. He could enforce this right by suit, or avail himself of it as a defence to an action of ejectment. He may very well have preferred a judgment payable presently, to even second mortgage bonds payable at a distant day. Whatever may have been his motive for rejecting the bonds, it is undisputed that he did reject them, and he must be held to all the legal consequences of his act. After such rejection the company had full control and dominion over them. They could sell them in the market, or pledge them for their debts. Ahl had no further claim upon them. He had a right of action against the company, nothing more.

But there is another serious obstacle in the way of Mr. Ahl. He has no standing in a court of equity to claim anything of this company until its debts are fully paid. The stockholders have an equity which entitles them to have its assets applied to the payment of its liabilities before Mr. Ahl can be allowed to lay his hand upon a dollar of its effects. This equity of the stockholders

enures to the benefit of the judgment creditors of the company. John Rice, as a judgment creditor, claims and is entitled to its benefit.

Upon this branch of the case the auditor has found the facts very fully. We need only to refer to a few, about which there is little dispute. This corporation was gotten up by Daniel V. Ahl and Richmond L. Jones. Each had an object. Ahl wanted to sell his ore-lands, and Jones desired the contract to build the road. Each succeeded in his purpose. Ahl sold his lands and Jones obtained the contract. They controlled the corporation absolutely. Ahl held a large majority of the stock originally, and elected a board of directors to do the work that Mr. Jones, his co-schemer, required done. There was the form of an organization; there were a few outside stockholders scooped up by Ahl's net; but for all practical purposes the corporation was Ahl & Jones, or Jones & Ahl, it is not material which. In considering the question whether these gentlemen are entitled to any portion of the fund, we must scrutinize closely the contract made by each with the company. While the right of a stockholder to contract with his corporation and become its creditor, is conceded as a general proposition, the right of a person controlling a corporation to contract with it, rests upon entirely different principles, if it exists at all. Where a person has the actual control of a corporation, whether such control arises from the ownership of a majority of the shares, or from his position or influence, and enters into a contract with such corporation, he is to be held to the most rigid good faith. The onus is upon him to show the fairness of the transaction, if it is called in question. It is a principle too well settled to be now successfully controverted, that the promoters, directors or agents of a company, shall not make a profit out of it in buying lands for it, or in dealing with it. This principle runs through all the fiduciary relations: Simons *v.* Oil company, 11 P. F. Smith 202; McElhenney's Appeal, Id. 188; Short *v.* Stevenson, 13 Id. 95; The Railroad Co., *v.* Bowers 12 Wright 37; Bailey *v.* The Gas Co., 19 P. F. Smith 340; Bank *v.* Judah, 8 Conn. 145; Abbott *v.* The Rubber Co., 33 Barb. 593; Michoud *v.* Girod, 4 Howard 554: Hill on Trustees 148. Tried by this crucial test what becomes of Mr. Ahl's contract for the sale of his ore-lands? The master finds that in his first negotiations with Jones, Ahl put his 5400 acres at $100,000, which was probably their full value. It is clear that the price originally contemplated for the lands was $50,000 in cash, $50,000 in stock and $50,000 in bonds. Yet after the company had been organized; after over $100,000 in outside subscriptions to the stock had been made, Ahl demands better terms. He had the company at a disadvantage, and he virtually compels the agreement of December 9th 1869, by which he was to have $50.000 in money, $130,000 in bonds, and $120,000 in stock, for about

[Rice's Appeal.]

three-fourths of the land which he had previously estimated at, and was willing to sell for $100,000. It was no answer to this to say, that as the previous negotiations had not been closed up Mr. Ahl had the right to make the best terms he could. This might have been so had he been dealing with a stranger at arm's length. But he was not. He was dealing with a corporation that was practically his own creature. He was in effect dealing with himself. The agreement of December 7th, was virtually forced upon the company. So far as Mr. Ahl is concerned, that agreement was a fraud in law and a fraud in fact. That a man may get up a corporation for the purpose of selling his lands, and after gathering in a few innocent and unfortunate stockholders, from whom his purpose is studiously concealed, proceed to put off his lands upon them, not at a fair price, but for such sum as his avarice or the helpless condition of the company may tempt him to exact, is a proposition too monstrous to obtain the sanction of a court of equity. I am aware that a loose morality has prevailed to some extent in railroad and monetary affairs. It may be in part the result of the speculations induced by an inflated currency, and must run its course until checked by the reaction of a more healthy public sentiment.

It will thus be seen that Mr. Ahl has no claim to any portion of the ninety-seven bonds. They were specifically pledged by authority of the company for certain claims of the Reading banks and Bushong & Brother. I have already said that the latter were holders for value, and that the bonds passed by delivery. The master was clearly right in awarding to these claimants the amount of their claim for which said bonds were so pledged.

The master rejected the claim of Richmond L. Jones to the remainder of the bonds held by the Kensington Bank, after the debt of said bank is satisfied. He is of opinion that the claims of Ahl and Jones rest upon similar principles. Fortunately for Mr. Jones, the facts are different. The master does not find that the contract between Mr. Jones and the company for constructing the road was a fraud upon said company. Nor that he afterwards sought to alter it, and used his position to extort different and oppressive terms. He made his contract and adhered to it faithfully. We have no means of knowledge as to what extent it was profitable. Nor was Mr. Jones a party to Ahl's fraud in the sale of his ore lands. He resisted it as far as he could. We think the master was right in finding that Richmond L. Jones contemplated no fraud upon the company. His chief offence appears to have been the undertaking of a work entirely disproportioned to his means. This involved struggles and shifts to raise money. That some of his transactions while thus engaged were irregular, is apparent. But we fail to perceive in any of them an intent to defraud the company. His acts, whether good or bad, appear to

have been the result of an honest endeavor to save the credit of the corporation. If, in the struggle, he has to some extent damaged his own, the punishment is by no means inconsiderable. The law does not require that we should add to it the loss of his bonds. The master has reported against his individual claim. We do not see any sufficient reason to disturb this finding; but his claim as a bondholder to the residue of the sixty-five second mortgage bonds, after satisfying the claim of the Kensington Bank, should have been allowed.

The master rejected the claim of Messrs. Bushong & Bro., upon a judgment entered against R. L. Jones for $5333.33, and also upon a note for $250. He also rejected the claim of the Reading Savings Bank upon a note of R. L. Jones for $5806.91. These liabilities were incurred by Mr. Jones on the faith of the resolutions of April and May 1871. It is conceded they were for the benefit of the company. Are the holders of these claims entitled to the protection of the ninety-seven second mortgage bonds? The principle is well settled, that where a surety, or a person standing in the position of a surety, for the payment of a debt, receives security for his indemnity, and to discharge such indebtedness, the principal creditor is in equity entitled to the benefit of that security, and it makes no difference that the principal creditor did not know of this at the time, or give credit on the faith of it: Cornwell's Appeal, 7 W. & S. 305; Erb's Appeal, 2 Penna. R. 296; Himes v. Barnitz, 8 Watts 39; Carman v. Noble, 9 Barr 366; Hancock's Appeal, 10 Casey 155. The master concedes the truth of this general proposition, but says, substantially, that Jones' relations to the company are such, that as surety, he is not entitled to claim. and that, therefore, these holders are not. We do not regard this position as sound. The debts upon which the claims are based, were contracted for the use of the company. The latter received the consideration. The bonds were placed in the hands of Jones to cover these among other liabilities. It is true they were not specifically pledged by Jones for these claims. But they were pledged to Jones by the company, for the purpose of procuring these loans, and therefore the holders of the claims are entitled to the benefit of the security. This right does not depend upon the equities between Jones and the company, arising out of other transactions. There is a surplus of bonds in the hands of the trustees. What disposition shall be made of them? It is clear that Jones is not entitled to them as security for any balance the company may owe him on his individual account. They were not pledged as security for any such indebtedness to him, and if they were, the master has not found that the company is indebted to him, or that he is liable as guarantor or otherwise, for any other moneys obtained for the use of the company on the pledge or security of the bonds. The surplus bonds, therefore, whatever

[Rice's Appeal.]

their amount, belong to the company, which is not entitled·to any portion of the fund until its debts are paid.

To avoid the delay which must necessarily result from sending this case back to the master, I have prepared a corrected table of distribution. (Prout schedule.) It will be observed, that according to the master's report, there is an accumulation of interest amounting to $30,900. A considerable amount of interest must have accrued since. The payments made under the first master's report, including the trustee's fee and payments made by the trustee since, and the master's fee in this case, amounting in the aggregate to $17,752.90, as well as the costs of this appeal, are to be paid out of the interest. The balance of the interest will be distributed pro ratâ to the different claims allowed.

DECREE.

This cause came on to be heard at the last January Term of this court, at the city of Philadelphia, upon exceptions to the report of George Junkin, Jr., Esq., master, and was argued by counsel, whereupon, this 24th day of November 1875, it is considered, adjudged and decreed by the court, that all of the exceptions filed to said report be dismissed, except in so far as they are sustained in this opinion; and it is now further ordered that distribution of the principal of the fund in controversy, shall be made as follows, viz.: to the Farmers' National Bank of Reading, the sum of $28,834.95; to the Reading Savings Bank, the sum of $28,834.95; to Henry M. Keim, the sum of $3554.76; to John Rice, on account of his bonds, the sum of $30,492.85; to the Farmers' National Bank of Reading, before named, the further sum of $31,366.23; to the Reading Savings Bank, before named, the further sum of $14,312.83; to Bushong & Bro., the sum of $45,986.56; to the Kensington National Bank, the sum of $34,938.84; to Richmond L. Jones, the sum of $47,054.43; to John Rice, on account of his judgment, the balance of said principal, amounting to the sum of $39,623.60; that as to the interest on said fund reported by the master, as well as the interest which has accumulated since, there shall be deducted therefrom the payments made under the first master's report, including trustee's fee, and payments made by trustee since, as per master's report, and master's fee in this case, aggregating the sum of $17,752.90; and also the costs of this appeal. The residue of the interest remaining after these deductions shall be distributed, pro ratâ to the different claims allowed in this opinion

[Rice's Appeal.]

and decree; and the prothonotary of the Eastern District is directed to ascertain the amount of such interest, and to add the pro ratâ share to each claim allowed as aforesaid.

Chief Justice Agnew and Mr. Justice Woodward dissented from that part of the opinion and decree rejecting Ahl's claim.

Mr. Justice Paxson delivered a supplemental opinion and decree, January 13th 1876.

A question has been raised in regard to the proper construction of so much of our decree of November 24th 1875 as directs distribution of the interest. We are also informed that by reason of an advance in the market value of the securities in which the fund was invested, a considerable sum has been realized by their sale over and above the cost of said securities. The entire amount of said interest, less the deductions referred to in said decree, with the amount of said increase, making together the sum of $51,753.35, has been paid into court, and awaits our further order.

It is urged, on behalf of John Rice, that as to the increase in the fund, it is to be treated as principal, and awarded to him upon his judgment; and that as to the interest, by the terms of our said decree, he is entitled to a pro ratâ share thereof upon the whole amount of his judgment ($125,000). If the language of our decree will bear such a construction, it must be modified. The interest is the product of the principal. Each of the parties is entitled to interest in exact proportion to his share of the capital earning such interest. So likewise as to the increase of the fund. The rights of the parties to the principal were adjusted as of the day of sale. Since then the fund as a whole has grown or increased a certain amount or per centage. It follows that the share of each creditor entitled to participate in the distribution has grown in a corresponding ratio, and he will be entitled to said increase in the same proportion that the amount of principal awarded him bears to the entire principal of said fund.

The Kensington Bank claims that as between it and Richmond L. Jones, it is entitled to interest to the day of distribution. This may be so, but we do not think we are called upon to adjust such equity in this proceeding. We leave it open for the adjustment of the parties, without prejudice to the rights of either.

[Rice's Appeal.]

SUPPLEMENTAL DECREE.

And now, January 13th 1876, it is further ordered, adjudged and decreed that the fund in court, amounting to $51,753.35, less proper costs and commissions of the prothonotary, be distributed by the prothonotary to the parties entitled to the principal fund under our decree of November 24th 1875, in the exact proportion which the amount of principal awarded to them respectively bears to the whole of said principal sum, provided that no creditor shall be paid more than his debt and interest to the day of distribution, and the excess, if any, to be applied to the judgment of John Rice.